264 F.2d 417
 APACHE POWDER COMPANY, a corporation, Appellant,
v.
ASHTON COMPANY, Inc., Contractors and Engineers, formerly
Ashton Building Company, and Mardian Construction Company,
corporations engaged in Joint Venture as Ashton-Mardian
Company, and Travelers Indemnity Company, a corporation, Appellees.
 No. 16052.
 United States Court of Appeals Ninth Circuit.
 Feb. 24, 1959.
 
 Evans, Kitchel & Jenckes, Alfred B. Carr. Phoenix, Ariz., for appellant.
 Hall, Catlin & Jones, Hamilton R. Catlin, Conner & Jones, A. O. Johnson, Tucson, Ariz., for appellees.
 Before POPE, Chief Judge, and HAMLEY and HAMLIN, Circuit Judges.
 HAMLIN, Circuit Judge.
 
 
 1
 This action was instituted in the District Court of Arizona by the United States, for the use of Apache Powder Company, a corporation, against the Ashton Company, Inc., and Mardian Construction Company, corporations, engaged in a Joint Venture as Ashton-Mardian Company, the Travelers Indemnity Company, a corporation, Pioneer Constructors, a corporation, and Construction Materials Company, a corporation. A judgment was rendered by the District Court against the plaintiff therein and in favor of Ashton-Mardian Company and Travelers Indemnity Company, and in favor of the plaintiff and against Pioneer Constructors in the sum of $18,947.96. The action was brought under the Act of Congress of August 24, 1935 (40 U.S.C.A. 270b),[1] known as the Miller Act, on the payment bond of the contractor under a contract with the United States of America which was performed and executed within the District of Arizona. Apache appealed to this Court from the judgment rendered against it and in favor of Ashton-Mardian and Travelers Indemnity.
 
 
 2
 Jurisdiction of the District Court was based on said 270b, and in this Court on 28 U.S.C. 1291.
 
 
 3
 The District Court held that Apache did not comply with the Miller Act in that it did not serve written notice on Ashton-Mardian within ninety days of the last materials supplied by Apache to Pioneer Constructors, and thus, under the Miller Act, could not recover on the payment bond for moneys owed it on that claim. We do not agree.
 
 
 4
 It was established at the trial before the District Court, sitting without a jury, that Ashton-Mardian Company, hereinafter prime contractor, entered into a written contract with the United States of America, Corps of Engineers, United States Army, under which the prime contractor agreed to furnish material and to perform work for the construction and completion of Air Force Station TM-181, a radar station five miles north of Ajo, Arizona. Upon the same date, pursuant to the terms of said contract and of the Miller Act, the prime contractor and The Travelers Indemnity Company as surety, executed and delivered to the United States of America their payment bond for $940,655.04, the condition of which bond as required by the Miller Act being that the principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract.
 
 
 5
 The prime contractor entered into a subcontract with Pioneer Constructors for the performance and completion of certain parts of the work under the prime contract. The subcontract's specifications were in accordance with the plans, specifications, terms and conditions of the prime contract, and it was undertaken by Pioneer for $401,217.83. The subcontract applied principally to the construction of the roadway on the Ajo job.
 
 
 6
 It appears that Pioneer Constructors had dealt with Apache Powder Company on other jobs and had an open account with Apache. Apache contacted Pioneer and obtained a contract to furnish to Pioneer explosives and blasting supplies required by Pioneer for use in the performance of its subcontract at the usual list prices less discounts which were known to the subcontractor. There was no written agreement between Apache and Pioneer, each transaction apparently being the result of a verbal order by Pioneer, the writing up of that order by Apache, and the later delivery by Apache to Pioneer of the supplies specified on the order.
 
 
 7
 Beginning with June 24, 1956, Paul A. Swagerty, then an employee of Pioneer, ordered all of the materials from Apache. These orders were apparently all given by telephone. Paul Negley, a shipping and billing clerk in the accounting department of Apache, received most of the telephone orders and those he did receive were from Swagerty.
 
 
 8
 Late in the month of October, 1956, Pioneer and Construction Materials Company, an Arizona corporation, hereafter Construction, began negotiations between themselves looking to arrangements whereunder Construction would replace Pioneer as the subcontractor on the job as of November 1, 1956. J. E. Skorpick and Thomas E. Moore were, respectively, president and vice-president of both Construction Materials Company and of Pioneer Constructions. The two men were minority stockholders in Pioneer and majority stockholders in Construction.
 
 
 9
 Skorpick and Moore represented both companies in negotiating with the prime contractor in reference to Construction taking over and completing Pioneer's contract with the prime contractor. These negotiations were carried on between Skorpick and Moore and the prime contractor during the latter part of November, 1956. The prime contractor at that time orally agreed that Pioneer might terminate its contract with it, and that Construction Materials might complete the job on the condition, however, that a new surety bond would be issued to Construction Materials covering the completion of the contract. About January 8, 1957, such a bond (with the same surety company) was furnished and the contract with Construction Materials was signed by the prime contractor.
 
 
 10
 From the time the job began in June, 1956, Swagerty was the construction superintendent and purchasing agent for Pioneer, and Simmons was the assistant secretary and office manager of Pioneer. In the early part of November, 1956, Swagerty and Simmons apparently discontinued their employment with Pioneer, but continued on with Construction Materials, holding the same positions with Construction Materials as they had with Pioneer. There was no cessation of work on the job during this changeover, and it appears that both Pioneer and Construction Materials occupied the same offices, had the same address and the same telephone.
 
 
 11
 The evidence discloses that on December 4, 1956, Swagerty in giving a telephone order to Apache for more blasting supplies, talked to Paul Negley of Apache. Negley made pencilled notations of this conversation which were admitted into evidence. Negley testified that 'Mr. Swagerty informed me upon giving me this order that the balance of the materials for the Ajo job should be billed to Construction Materials Company, Construction Division, Tucson, Arizona, and that this division, this company is a division of Pioneer Constructors.' Negley then testified that he had made the following notation on the order: 'above is division of Pioneer Constructors.' The written memorandum in evidence verifies this. Negley reported this conversation to his superiors.
 
 
 12
 Another witness, Simmons, testified that on or about December 10, 1956, he had a telephone conversation with someone in the accounting or bookkeeping department of Apache. He did not remember to whom he talked, but he testified that he explained that the powder being sent to the Ajo job should have been billed to Construction, and said, 'I would appreciate if they would bill it to Construction Materials.' Apache denied that any one at their office received such a call and produced witnesses to that effect. It is not contended by any one that Apache at any time prior to March 19, 1957, was in words or writing specifically informed of the termination of Pioneer's subcontract or of the new contract with Construction.
 
 
 13
 Thereafter, from time to time, up until and including March 12, 1957, further orders from Swagerty were received for blasting supplies. All of these orders were filled by Apache and billed to Pioneer Constructors, P.O. Box 2768, Tucson, Arizona, which was the same address to which bills had been previously sent. No objection was made to such billing by Construction Materials. A check dated 12/27/56 in the sum of $4,723.37 was sent by Construction Materials Company to Apache. Attached to the check was a voucher stub upon which the following was typed:
 
 
 14
 "12 27 56
 Billed to Pioneer Const.
 Inv. 42088
 42175
 42256 $4723.37"
 
 
 15
 The invoices referred to above were for material ordered, billed, shipped to, and receipted for in the name of Pioneer Constructors during November, 1956. On February 12, 1957, Construction Materials forwarded to Apache a check in the sum of $3,417.74, upon which was typed on the voucher stub attached to it the following:
 
 
 16
 "covers the following Invoices
 
 
 17
 42291
 42308 Billerd (sic) to pioneer (Constructors was added
 42406 in ink and pioneer was
 underlined in ink)
2-12-57 Accounts Payable 3,417.74"
 
 
 18
 The referred-to invoices were for supplies furnished in December, 1956. On April 12, 1957, Apache received an additional payment from Construction Materials in the amount of $4,411.91 with similar typed notations on the voucher stub, listing certain itemized invoices covering supplies furnished in January, February and up to March 12, 1957. The total of these three checks equalled the amount of all blasting supplies furnished by Apache on the job subsequent to November 1, 1956.
 
 
 19
 The last delivery made by Apache on the job was March 12, 1957.
 
 
 20
 Apache applied the above checks to the account of Pioneer and on December 31, 1956, January 31, February 28, and on March 31, 1957, apache mailed bills addressed to Pioneer showing the balance due Apache after crediting (to the balance due) the payments received from Construction on December 29, 1956, February 14, 1957, and March 12, 1957. Construction Materials, although it received these bills (having the same address as Pioneer), made no objections to Apache as to the amount shown due thereon, and did not by letter or telephone communicate with Apache about them.
 
 
 21
 On March 19, 1957, Apache through telephone calls was told of the termination of the Pioneer subcontract and the execution of Construction's subcontract. On the same day, Mardian Construction Company wrote a letter to Harold Ashton, president of one of the joint ventures, and advised him in this letter of the fact that it had been advised by Apache that there was due and owing to Apache for supplies furnished on the Ajo job some $25,000. This letter was admitted in evidence.
 
 
 22
 There is no question but that the prime contractor received actual notice that Apache had not been paid and had a claim for its unpaid amounts. This notice was received on March 19, 1957, which was within ninety days of the date on which Apache delivered its December 20 order. On December 20, it must be admitted that Pioneer was still the subcontractor in fact, and its contract had not been terminated until January 8, 1957. Thus, the prime contractor had ample time to protect itself from a double claim.
 
 
 23
 Swagerty's admitted failure to advise Apache in his December 4 telephone call that the Pioneer contract had been terminated, as well as the failure of anyone in Construction Materials to either orally or in writing so advise Apache, conceivably could have been due to Construction's desire to trade upon Pioneer's credit. But this is mere conjecture.
 
 
 24
 Appellant contends that the notice received by the prime contractor on March 19, 1957, is a sufficient compliance under the Miller Act. It cites cases that hold that the statute should be liberally construed. Fleisher Engineering & Construction. Co. v. United States for Use and Benefit of Hallenbeck, 1940, 311 U.S. 15, 61 S.Ct. 81, 85 L.Ed. 12; Liebman v. United States for Use and Benefit of California Electric Supply Co., 9 Cir., 1946, 153 F.2d 350; Glassell-Taylor Co. v. Magnolia Petroleum Co., 5 Cir., 1946, 153 F.2d 527; Coffee v. United States for Use and Benefit of Gordon, 5 Cir., 1946, 157 F.2d 968; Houston Fire & Casualty Ins. Co. v. United States for Use and Benefit of Trane Co., 5 Cir., 1954, 217 F.2d 727.
 
 
 25
 It also cites the reasons given in the Coffee case, supra, for the requirement of written notice,[2] and contends that in this case the facts were established without question, and that actual notice was received by the prime contractor on March 19, 1957.
 
 
 26
 There is no question but that the Miller Act should have a liberal construction. It is remedial in nature and entitled to a liberal construction in order to effect the legislative intent to protect those whose labor and material go into public projects. Bowden v. United States, for use of Malloy, 9 Cir., 1956, 239 F.2d 572. However, it is not necessary to pass upon whether the telephone notice of March 19 and the letter written the same day by Mardian to Ashton is sufficient to satisfy the statute.[3]
 
 
 27
 On the basis of the evidence, the substance of which has been set out herein, the District Court made findings numbered 10, 16, and 17.[4] We find that there was not sufficient evidence to justify said findings, and that they are clearly erroneous. Rule 52(a), F.R.Civ.P., 28 U.S.C.
 
 
 28
 There was no evidence that Apache had ever been advised until March 19 of the termination of Pioneer's subcontract and of Construction's new contract. The latter had never asked for credit from Apache, had never rejected materials shipped to Pioneer, but had accepted these materials and used them on the job. It had paid bills made out to Pioneer and never objected to Apache's crediting moneys it received from Construction to the balance of its account with Pioneer.
 
 
 29
 We also find that there was no sufficient evidence that Apache 'did not act with ordinary prudence in protecting its rights as against the prime contractor and its surety.' We hold that the evidence was not such as to require Apache in the exercise of any ordinary prudence to make any inquiry. Giving to the telephone call of December 4 its full value, and likewise to the purported call of Simmons on December 10, all that was told Apache was to bill Construction Materials in the future.[5]
 
 
 30
 If Apache had inquired at that time during the month of December (which we hold they were not required to do) as to who was the subcontractor, the information received would necessarily have had to have been Pioneer, because it is admitted that Pioneer's subcontract was not terminated until January 8, 1957. Of course, it is not contended that the actions of the prime contractor, Pioneer and Construction at that time were communicated by any of those three persons to Apache, either then or at any time thereafter up to March 19.
 
 
 31
 The statute in question (the Miller Act) provides that a supplier in the position of Apache 'shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed.'
 
 
 32
 In this case, Apache did on April 25, 1957, give a written notice to the prime contractor, setting out that from June 13, 1956, to and including March 12, 1957, it furnished or supplied materials consisting of explosives and blasting supplies to Pioneer Constructors and Construction Materials Company of Tucson, Arizona, for use in the prosecution of the work provided for in said above-mentioned contract in the total amount of $33,453.71, of which $12,553.02 had been paid, leaving a balance of $20,900.69. The letter further provided that 'the last of said materials was furnished on March 12, 1957, and all of said materials was delivered by Apache Powder Company on the job and was used in the prosecution of the work provided for in said above-mentioned contract.'
 
 
 33
 We hold this written notice to be a sufficient compliance with the Miller Act so as to entitle Apache to its action under the payment bond. The notice 'stat(ed) with substantial accuracy the amount claimed and the name of the party to whom the material was furnished. * * *' The April 25 letter, sent by registered mail, is set out in the margin.[6] It notifies Ashton-Mardian that Apache furnished supplies to Pioneer and Construction, and that the last of such supplies was furnished on March 12. To deny Apache recovery on the payment bond because it treated the Pioneer-Construction account as one claim-- a treatment we find it was warranted in doing under the circumstances of this case-- would do violence to the spirit and intent of the Miller Act. Cf. United States for Benefit and on Behalf of Sherman v. Carter, 1956, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776.
 
 
 34
 The judgment is reversed with directions that judgment be entered in accordance with the views expressed herein.
 
 
 
 [1]
 40 U.S.C.A. 270b
 270b. Same; rights of persons furnishing labor or material
 '(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Such notice shall be served by mailing the same by registered mail, postage prepaid, in an envelope addressed to the contractor at any place he maintains an office or conducts his business, or his residence, or in any manner in which the United States marshal of the district in which the public improvement is situated is authorized by law to serve summons.
 '(b) Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit, but no such suit shall be commenced after the expiration of one year after the date of final settlement of such contract. The United States shall not be liable for the payment of any costs or expenses of any such suit. Aug. 24, 1935, c. 642, 2, 49 Stat. 794.
 
 
 [2]
 'Written notice is required to prevent misunderstanding and to afford certain evidence of the communication. The provisions for service afford means of making certain the fact of notice given, or of making a good service where the contractor can not be reached personally.' Coffee v. United States for Use and Benefit of Gordon, supra (157 F.2d 969)
 
 
 [3]
 Bowden v. United States for use of Malloy, 9 Cir., 1956, 239 F.2d 572, 577, held that--
 'The giving of the written notice specified by the statute is a condition precedent to the right of a supplier to sue on the payment bond; the writing must be sent or presented to the prime contractor by or on the authority of the supplier; and the writing must inform the prime contractor, expressly or by implication, that the supplier is looking to the contractor for payment of the subcontractor's bill.'
 Coffee v. United States for Use and Benefit of Gordon, 5 Cir., 1946, 157 F.2d 968; United States for Use and Benefit of American Radiator and Standard Sanitary Corp. v. Northwestern Engineering Co., 8 Cir., 1941, 122 F.2d 600; United States for Use of Bruce Co. v. Fraser, D.C.Ark.1950, 87 F.Supp. 1; and United States for Benefit and Use of Westinghouse Electric Supply Co. v. Robins, D.C.Mass.1954, 125 F.Supp. 25, also hold that written notice of the claim is a condition precedent to a right of action under the payment bond.
 For a holding contra, see Houston Fire & Casualty Ins. Co. v. United States, 5 Cir., 1954, 217 F.2d 727.
 We need not inquire into the features of the instant case that conceivably distinguish it from Bowden v. United States, for Use of Malloy, supra.
 
 
 [4]
 'Findings of Fact
 '10. That defendant Pioneer Constructors ceased the doing of any work on the aforesaid job on October 31, 1956, and Construction Materials Company did perform all work encompassed under the Pioneer Constructors' subcontract done on and after November 1, 1956.
 '16. That after December 4, 1956, and not later than January 8, 1957, plaintiff Apache Powder Company had knowledge and information which would have led a reasonably prudent person in the same situation to make an investigation of the subcontract situation on the aforesaid job and the relationship of Pioneer Constructors and Construction Materials Company thereto; that if it had made such investigation, plaintiff Apache Powder Company would readily have learned not later than January 8, 1957, that all materials which it furnished to the aforesaid job after December 4, 1956, had been ordered by Construction Materials Company, received by Construction Materials Company, and used by Construction Materials Company on the aforesaid job and that defendant Pioneer Constructors had not ordered or received or used any of the materials furnished by plaintiff Apache Powder Company since December 4, 1956; that plaintiff Apache Powder Company would have learned that defendant Pioneer Constructors had in fact ceased to do any work on the aforesaid job on October 31, 1956, and that all work done on the aforesaid job thereafter had been done by Construction Materials Company.
 '17. That plaintiff Apache Powder Company failed to make any reasonable effort under the circumstances to ascertain the facts regarding the subcontract situation and the relationship of Pioneer Constructors and Construction Materials Company thereto; that plaintiff Apache Powder Company did not act with ordinary prudence in protecting its rights as against the prime contractor and its surety.'
 
 
 [5]
 To more readily appreciate the question of what notice can be imputed to Apache as a result of the December 4 telephone call, considered the following: Whom did Swagerty represent at the time of the telephone conversation? No contention is made that in this conversation Swagerty said he was no longer employed by Pioneer or that he was then employed by Construction. Did he call as Pioneer's agent directing Apache to bill Construction for all future shipments? Would this bind Apache? Was Swagerty calling as Construction's agent at this time? If so, would this authorize Apache to cease billing Pioneer? Was Swagerty calling as Pioneer's agent in authorizing Apache to cease billing Pioneer, but calling as Construction's agent in authorizing Apache to bill Construction?
 Clearly, the recipient of the call, Paul Negley, Apache's billing clerk, should not have been expected to inquire into the legal subtleties of which 'hat' Swagerty was wearing during each part of the telephone conversation. Negley had dealt with Swagerty as Pioneer's agent, and knew that Swagerty was still running the Ajo job. Negley testified, both on direct and on cross examination, that he was 'positive' Swagerty told him that Construction Materials was a division of Pioneer, and that he pencilled a notation to that effect.
 Apache's field men periodically reported on the progress of the job and informed the office that there was no change in management, personnel, equipment, or in the work schedule.
 In this posture, we cannot find that Apache had any notice of a change in the subcontract situation.
 
 
 [6]
 'Evans, Kitchel & Jenckes
 8th Floor Title & Trust Building
 Phoenix, Arizona
 April 25, 1927
 'Registered Mail
 Ashton-Mardian Company
 (Joint Venture) P. O. Box 7065 Tucson, Arizona Ashton Building Company P. O. Box 7065 Tucson, Arizona Mardian Construction Company 1314 North 21st Avenue Phoeniz, Arizona
 'Re: Corps of Engineers, U.S. Army Contract for Air Force Station TM-181 at Ajo, Arizona
 'Gentlemen:
 'Pursuant to subparagraph (a), 270b, Title 40, United States Code Annotated, you are hereby notified as the contractor in the above-mentioned contract, who furnished the Payment Bond to the United States of America, that from and including June 13, 1956, to and including March 12, 1957, Apache Powder Company of Benson, Arizona, furnished or supplied materials consisting of explosives and blasting supplies to Pioneer Constructors and Construction Materials Company of Tucson, Arizona, for use in the prosecution of the work provided for in said above-mentioned contract in the amount of Thirty-three Thousand Four Hundred Fifty-three and 71/100ths Dollars ($33,453.71), of which Twelve Thousand Five Hundred Fifty-three and 02/100ths Dollars ($12,553.02) has been paid, leaving a balance of Twenty Thousand Nine Hundred and 69/100ths Dollars ($20,900.69).
 'The last of said materials was furnished on March 12, 1957, and all of said materials was delivered by Apache Powder Company on the job and was used in the prosecution of the work provided for in said above-mentioned contract.
 'Yours very truly, Apache Powder Company By Evans, Kitchel & Jenckes By (s) William A. Evens By (s) William A. Evans Powder Company.'