456 F.2d 148
 UNITED STATES, for the Use of POMONA TILE MANUFACTURING
COMPANY, a corporation, Plaintiffs-Appellees,
v.
David L. KELLEY d/b/a David Kelley Tile Company, a sole
proprietorship, et al., Defendants-Appellants.
 No. 26490.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 23, 1972.
 
 Douglas B. Jensen, of Miller, Groezinger, Pettit & Evers, San Francisco, Cal., for defendants-appellants.
 Douglas K. Wallace, of Wallace, Brown & Crain, Newport Beach, Cal., McCormick & Williams, Los Angeles, Cal., for plaintiffs-appellees.
 Before MERRILL, BROWNING and WRIGHT, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 Pomona Tile, which furnished tile and supplies to a subcontractor on a government project at Fort Ord, California, sought recovery under the Miller Act (40 U.S.C. Sec. 270b) for unpaid material bills. Pomona took a default judgment against David Kelley, the subcontractor. The prime contractor, Jay De Construction Co., raised defenses of (1) noncompliance with the Act's 90-day notice requirement, (2) partial payment, and (3) diversion of materials by the subcontractor. The district court awarded $12,394.12 to Pomona. We affirm.
 
 
 2
 Jay De held a government contract to renovate housing units at Ford Ord. It posted a payment bond, as required by the Miller Act, for the benefit of laborers and materialmen. Hartford Accident and Indemnity Company was surety on the bond.
 
 
 3
 Jay De engaged David Kelley, d/b/a Kelley Tile Company, as a subcontractor to install ceramic tile in the houses. Pomona agreed, on January 4, 1967, to supply Kelley with materials for the job, on condition that Jay De sign a joint checking agreement. The same day Pomona began to furnish tile to Kelley and by late February 1967 had supplied material worth $17,990.64. Jay De by March 10, 1967, had sent four joint checks totalling $16,000, of which Pomona released $6,319.70 to Kelley, to allow him to meet his labor payroll.
 
 
 4
 Kelley did not progress with his work to Jay De's satisfaction and the latter rescinded the subcontract on June 26, 1967, but retained Kelley on a daily wage basis. Thereafter Jay De paid Kelley directly and sent Pomona no further joint checks. Pomona continued to provide Kelley with supplies, Jay De having neglected to inform it of the termination of Kelley's contract. By September 1967 Pomona had furnished Kelley with material worth $22,074.50.
 
 I.
 
 5
 An unpaid materialman must notify the prime contractor of his claim within 90 days of the last delivery to the subcontractor. Pomona last furnished Kelley with materials on September 21, 1967. It sent notice to Jay De on September 26, 1967.
 
 
 6
 Jay De argues that the statutory notice period began to run when the prime contractor terminated the subcontract. This is true in many circumstances, and the cases impose a duty upon the materialman to keep himself informed about his customer's activities on the job site. See, e.g., Frank Briscoe Co. v. United States for Use and Benefit of Western States Machinery Co., 396 F.2d 847 (10th Cir.1968); United States for Use and Benefit of Miller & Bentley Equipment Co. v. Kelley, 327 F.2d 590 (9th Cir.1964).
 
 
 7
 This line of authority does not control in the instant case. Here, although Jay De rescinded the subcontract, Kelley remained on the job. To all appearances Kelley still held the contract. He continued to pick up material for hauling to Fort Ord. Pomona gave him invoices, which Kelley agreed to pass on to Jay De. Pomona had no reason to suspect that Kelley's status had changed, though it was in close contact with him. These facts bring this claim within the spirit of Apache Powder Co. v. Ashton Co., 264 F.2d 417 (9th Cir.1959), another case in which the parties' behavior could not reasonably be expected to put the materialman on notice of any change in the subcontractor's relationship to his prime.
 
 II.
 
 8
 The parties disagree in their interpretation of the joint check agreement. Jay De agreed to deliver its payments to Kelley by checks requiring joint endorsement of Kelley and Pomona. Pomona would satisfy its materials bills from these checks and Kelley would receive the balance. The arrangement allowed the materialman to rely on the credit of the prime contractor and also assured the supplier of control over the funds to pay his bills.
 
 
 9
 Jay De gave Pomona and Kelley four such checks, totalling $16,000. Pomona turned over a portion of each to Kelley and credited the remainder against the tile bills. Jay De now argues that their agreement contemplated that Pomona would keep all payments received until all charges for tile had been satisfied. In Jay De's view, Pomona gratuitously became a general creditor of Kelley by releasing to him part of the joint check proceeds.
 
 
 10
 Pomona's credit manager testified that most tile manufacturers customarily release some funds to the subcontractor whenever a joint check agreement is in force. The tile supplier asks the subcontractor for an estimate of the tile installed, then deducts from each joint check an amount corresponding to that quantity. As the credit manager explained it, the practice results in keeping the tile manufacturer's inventory at the job site rather than in a warehouse.
 
 
 11
 This turnover of funds allows the subcontractor to meet his labor payroll and other expenses, without being forced to make outlays from his own capital. According to Pomona, few tile installers have financial resources to carry their labor costs while waiting for the prime contractor to satisfy first all charges for material.
 
 
 12
 Normally the tile manufacturer incurs no risk by giving part of each check to the installer, since the prime contractor has assured it that joint checks totalling a known amount will pass through the tile manufacturer's hands. In this case, if Jay De had honored the joint check agreement by paying the full $31,000 listed in the contract, Pomona would have received full payment though it had made partial disbursements to Kelley from each check.
 
 
 13
 We think the parties probably expected Pomona to make partial releases of joint check funds to Kelley. Certainly Jay De knew that Kelley could not pay his men without receiving some payment from Jay De before all of the tile had been supplied.
 
 
 14
 The only other court to consider the "payment" defense in similar circumstances also rejected it, holding that the materialman had no legal obligation to deduct its current balance due from each check. See United States for Use and Benefit of Clark-Fontana Paint Co. v. Glassman Construction Co., 397 F.2d 8 (4th Cir.1968).
 
 III.
 
 15
 Jay De asserts that Kelley diverted material to other jobs and that Pomona should have known this was happening. The evidence of diversion was thin, but the defense would fail even if Jay De had adequately shown fraud by Kelley. A materialman need not prove that his material was actually installed by the subcontractor, nor need he deliver the material to the job site himself. He may recover upon showing a reasonable, good faith belief that the subcontractor intended the material for the government job. See e.g., United States for Use and Benefit of Carlson v. Continental Casualty Co., 414 F.2d 431 (5th Cir.1969); Roscoe-Ajax Construction Co. v. United States for Use and Benefit of Tayler Products Corp., 351 F.2d 305 (9th Cir. 1965); United States for Use and Benefit of J. P. Byrne & Co. v. Fire Ass'n, 260 F.2d 541 (2d Cir. 1958); United States for Use and Benefit of Color Craft Corp. v. Dickstein, 157 F.Supp. 126 (E.D.N.C.1957).
 
 
 16
 Jay De argues that Pomona should have suspected Kelley because he picked up some material at the Pomona warehouse in Colton, California, 400 miles from Fort Ord. Pomona also maintains a warehouse at San Jose, considerably closer to Fort Ord. The record shows that Kelley obtained material from the Colton warehouse as early as January 11, 1967, one week after Pomona had shipped two large truckloads of tile to Fort Ord. Kelley made numerous other pickups at Colton, mostly of fairly light supplies.
 
 
 17
 A Pomona witness testified that Kelley could transport tile from Colton himself more cheaply than Pomona could have it shipped. So the only possible ground for suspicion would have been Kelley's choice of the Colton warehouse instead of the San Jose one. The reason for that choice is not hard to find. Kelley lived in Colton and apparently commuted between Colton and Fort Ord. The Pomona people knew that Kelley lived in the area, and presumably were not surprised to see him stopping at the Colton warehouse.
 
 
 18
 The evidence of diversion by Kelley is frail, and the evidence of bad faith by Pomona is nonexistent. Jay De is chargeable with all material delivered to Kelley. The judgment of the district court is affirmed.