UNITED STATES of America, for the Use of George W. FORDHAM

v.

P. W. PARKER, INC. and The Travelers Indemnity Company, Defendant and Third-Party Plaintiff,

v.

GEORGE W. PENNINGTON & SON, INC., Third-Party Defendant.

Civ. No. K–79–1962.

United States District Court, D. Maryland.

Dec. 29, 1980.

Michael B. Dickman, Rockville, Md., for plaintiff.

Tarrant H. Lomax, Annapolis, Md., for defendant and third-party plaintiff.

FRANK A. KAUFMAN, District Judge.

The United States, for the use of George W. Fordham (Fordham), doing business as Parkway Associates, brought this action against P. W. Parker, Inc. (Parker) and its surety, The Travelers Indemnity Company (Travelers), under the Miller Act, 40 U.S.C. § 270a, et seq., for monies owed Fordham by Parker's subcontractor, George A. Pennington & Son, Inc. (Pennington).[1] The issue posed in this case is whether the proviso in section 270b(a) is or is not satisfied.[2] A non-jury trial has been held, during which the testimony of Fordham, and of Alfred Wolf, Pennington's former operations manager, and of Ralph George, a vice-president of defendant Parker, was taken. Based upon that testimony, the exhibits ad-

---

1. Parker and Travelers filed a third-party claim in this case against Pennington in connection with which a default judgment has been entered against Pennington.

2. Section 270b(a) provides:

§ 270b. *Same; rights of persons furnishing labor or material*

(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: *Provided, however, That any person having direct contractual relationship* with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Such notice shall be served by mailing the same by registered mail, postage prepaid, in an envelope addressed to the contractor at any place he maintains an office or conducts his business, or his residence, or in any manner in which the United States marshal of the district in which the public improvement is situated is authorized by law to serve summons. [Emphasis added.]

mitted into evidence and the stipulations entered into by the parties, this Court hereby makes the following findings of facts:

*Facts*

(1) On or about April 20, 1978, Parker entered into a contract with the United States to construct a Computer Science Facility at Bethesda, Maryland. Pursuant to 40 U.S.C. § 270a, Parker and Travelers executed a surety bond on April 24, 1978. On June 12, 1978, Parker entered into a subcontract with Pennington under which Pennington agreed to perform certain of the work Parker had contracted to perform for the Taylor Center. Thereafter, on or about August 15, 1978, Parker agreed to pay Pennington $57,000 for that work. In order to execute its undertakings to Parker, Pennington ordered from Fordham certain materials set forth in a Pennington purchase order. Those materials were received by Pennington at the jobsite on October 21, 1978. In an invoice dated October 23, 1978, Fordham billed Pennington for those materials in the amount of $3,213.00. That invoice contained a "net 30" provision; at no time did Pennington protest the existence of that provision.

(2) Fordham maintained a daily telephone log which consisted of yellow legal-size pads, on which Fordham wrote lists of people and organizations he intended to call. Each page represented a different day. On the page for December 13, 1978, Fordham wrote "Call Pennington." However, Fordham did not call Pennington on that date. Though similar notations appear on the December 14 and 15 pages, Fordham also failed to call Pennington on those days. On December 18, 1978, Fordham did call Pennington—the log entry to "Call Pennington" on that day has a line through it. Fordham testified that he made that call in an effort to collect payment of the money he was owed, which was by then several weeks overdue.

(3) The words "Call Pennington" next appears on the log entry for December 26, 1978, but no line is drawn through those words. Fordham testified that he did not attempt again to reach Pennington before that date because he was preoccupied with other matters. On that date, Fordham was able only to speak with a secretary, who told him that no one was in because of Christmas.

(4) Pennington's name does not again appear on the log until December 29, 1978, when the words "Called Pennington" appear with a line drawn through them. Fordham spoke with Alfred Wolf, General Manager of Operations for Pennington, who told Fordham that Pennington was unable to pay Fordham because Parker was withholding sums due Pennington on the project.

(5) On the page for January 2, 1979, a checkmark appears next to the legend "Call Pennington." Fordham testified that he is unable to recall what happened on January 2, 1979 or the name of the person to whom he spoke at Pennington on that day. The name P. W. Parker also appears on the sheet for January 2, 1979. That is the first appearance of Parker's name on the telephone log; two lines are drawn through it. Fordham testified that the double line meant that the call was "pertinent." Fordham further testified that during that phone call to Parker, he spoke with Ralph George, and asked George how much Parker owed Pennington. Fordham testified that he (Fordham) found George congenial and cooperative, and that he (Fordham) raised with George the possibility of Parker issuing a check payable jointly to Pennington and Fordham if Fordham could obtain Pennington's consent. George told Fordham that Parker had had problems with Pennington and that Parker did owe money to Pennington and indicated that Parker would be willing to pay Fordham as much as, but not more than, Parker owed to Pennington. However, George warned Fordham that issuance of the check could not take place for a few weeks because Parker had not yet calculated the amount of the back charges claimed by Parker against Pennington. Fordham told George that Fordham would defer action on Fordham's claim against Pennington for a few weeks.

(6) George testified that he could not recall whether he had spoken with Fordham on or about January 2, 1979, but that he (George) might have so done. George stated that at that time Parker employed an accountant named Bruce Strasberg who occasionally exceeded his authority. George stated that if Fordham had asked on or about January 2, 1979 to speak to Parker's accounts payable department, Fordham's call would most likely have been transferred to Strasberg, and that Strasberg might have approved the joint check arrangement even though Strasberg lacked the actual authority so to do. George, however, stated that no efforts were made by Parker to inform those who dealt with Parker that Strasberg did not possess such authority.

(7) In a letter dated January 5, 1979 from Pennington to Fordham, Pennington confirmed its willingness to have Parker issue a check jointly to Pennington and Fordham. Wolf, Pennington's Operations Manager, testified that he (Wolf) would not have sent such a letter without first conferring with George. Wolf also stated that he had spoken with George on January 4, 1979, the same day he spoke with Fordham. Fordham testified that he (Fordham) had talked to Wolf on January 4, and that Wolf had informed him that Wolf would write a letter confirming the arrangement. Fordham did not himself thereafter write to George concerning the arrangement.

(8) Fordham stated that the January 4, 1979 conversation was the first contact he (Fordham) had had with George, and that the two had not had any prior business dealings.

(9) The phone logs do not again indicate Fordham's intention to call Pennington until January 23, 1979—four days more than 90 days after the October 21, 1979 delivery. Several references to Pennington appear in the log during the two weeks following that date. On February 5, 1979, the log contains the notation, "Call P. W. Parker." However, Fordham did not attempt to reach Parker on that date. Parker's name appears again on February 6, with a checkmark next to it. Fordham was unable to recall the substance of his discussion on that date with someone at Parker. Parker's name also appears on February 8 and 12, but Fordham did not call Parker on those days. Fordham did speak with George on February 13, at which time George told Fordham that the amount of the back charges claimed by Parker against Pennington had not yet been computed and that, accordingly, a joint check was not yet available. Two days later, on February 15, 1979, Parker received the original of the letter dated January 5, 1979 from Pennington to Fordham indicating Pennington's acquiescence to the joint check arrangement.

(10) On February 20, 1979, Fordham telephoned Parker, at which time George informed him that Parker was prepared to issue a joint check for $1100.00. Fordham told Parker that he would come to Parker's office to pick up that check, which Fordham in fact did do the following day. Attached to that check when Fordham picked it up was an undated message form with the heading of Parker which was signed by Bruce Strasberg.

(11) The amount invoiced by Fordham to Pennington on October 23, 1978, as aforesaid, exceeded the amount of the $1100 check by $2113.00.

(12) On March 30, 1979, Fordham sent to Parker a copy of a letter to Pennington repeating Fordham's request for that unpaid amount. On April 25, 1979, Fordham for the first time wrote directly to Parker, stating that if Fordham did not "hear from Pennington regarding payment in another fifteen days, we will have no other recourse but to apply to your bonding company for payment." On May 3, 1979, Fordham wrote to Travelers to apply for payment.

*Law*

Originally, in a written memorandum of law filed herein, Fordham contended that notice as required by section 270b(a) was, in fact, given by it to Parker and also took the position that, in any event, a contractual relationship existed between Fordham and Parker. However, prior to trial,

Fordham abandoned its notice-in-fact[3] argument, and limited its argument to the contention that the joint check arrangement and the oral discussions relating to it constitute a contractual relationship which permitted Fordham to "dispense with the required 90–day notice" provided for by section 270b(a). *United States ex rel. Henry Walke Co. v. Van de Riet,* 316 F.2d 912, 915 (4th Cir. 1963), and cases cited thereat.[4]

*United States ex rel. State Elec. Supply Co. v. Hesselden Constr. Co.,* 404 F.2d 774, 777 (10th Cir. 1968), involved a letter addressed to the prime contractor by the supplier of materials to a subcontractor. That letter was approved in writing by the prime contractor. Thereby, the prime contractor agreed to make all future payments to the subcontractor in the form of joint checks to the subcontractor and to the materialman. Quoting from *United States ex rel. Henry Walke Co. v. Van de Riet, supra* 316 F.2d at 915, the Tenth Circuit wrote in *Hesselden* (at 777; footnotes omitted):

> The trial court found that the letter agreement was nothing more than an agreement by Hesselden [the prime contractor] to make all future payments by checks payable to Fulkerson [the subcontractor] and appellant [the supplier of

materials to the subcontractor] jointly, and an agreement by appellant to continue supplying material to Fulkerson. The court found that the agreement did not place the parties in such a direct contractual relationship as urged by appellant.

A similar situation was dealt with in *United States for Use and Benefit of Henry Walke Co. v. Van de Riet.* In that case the subcontractor, Acme, was in weak financial condition. In order to get credit from its materialman, Walke, Acme executed an assignment of the proceedings of its contract with the prime contractor, Van de Riet, to Walke. The assignment was approved by Van de Riet. Subsequently, Acme became insolvent and defaulted under its subcontract. Walke brought an action against Van de Riet alleging that the assignment constituted a contract between Walke and Van de Riet whereby the latter agreed to pay Walke for the materials supplied to Acme. The court stated that:

> "It is clear that there was no contract, express or implied, whereby Van de Riet obligated itself to pay for such materials, and it is equally clear that there was *no contractual relationship,*

---

**3.** Fordham's said concession appears well founded. A telephone conversation is not enough to constitute notice under section 270b(a). *See United States ex rel. Excavation Constr., Inc. v. Glenn-Stewart-Pinckney Builders and Developers, Inc.,* 388 F.Supp. 289, 295–97 (D.Del.1975) (Latchum, C. J.) discussing *Fleisher Co. v. United States,* 311 U.S. 15, 61 S.Ct. 81, 85 L.Ed. 12 (1940), and citing and analyzing a number of other cases. *See also United States ex rel. Aurora Pump Co. v. Ranger Constr. Co.,* No. 77–1991 (4th Cir. Sept. 6, 1978); *United States ex rel. Acme Transfer & Trucking Co. v. H. S. Kaiser, Inc.,* 270 F.Supp. 215 (E.D.Wis.1967). Nor does a joint check arrangement of the type made orally by Parker, Pennington and Fordham or a letter re the same from Pennington to Parker constitute such notice. *See Bowden v. United States ex rel. Malloy,* 239 F.2d 572 (9th Cir. 1956), *cert. denied,* 353 U.S. 957, 77 S.Ct. 864, 1 L.Ed.2d 909 (1957). *Cf. United States ex rel. Henry Walke Co. v. Van de Riet,* 316 F.2d 912, 916 (4th Cir. 1963), in which a subcontractor's assignment to his material supplier of the subcontractor's right to receive payment from the prime contractor, which assignment was ap-

proved by the prime contractor, did not constitute section 270b(a) notice from the assignee to the prime contractor. The purposes of the written notice requirement are "to prevent misunderstanding between the parties and to afford certain minimal evidence of communication between the parties." *Glenn-Stewart-Pinckney, supra* at 296. The latter part of that rationale would seemingly be frustrated, despite the remedial nature of the Miller Act and the protection it is designed to confer upon persons like Fordham, if the statutory notice were deemed given in a case such as the case at bar when there is indeed a factual issue as to whether notice was ever given.

**4.** It is assumed, *arguendo,* that if Strasberg, rather than George, spoke with Fordham on January 2, 1979, Strasberg had apparent authority to enter into or to approve the joint check arrangement. *See generally* Restatement (Second) Agency § 8. In view of this Court's conclusion that no contractual relationship was entered into by Parker and Fordham, it is not necessary for this Court to determine whether such apparent authority existed.

express or implied, between Walke and Van de Riet, within the meaning of the Miller Act which would dispense with the required 90-day notice."

In the case at bar a review of the record shows that at no time did Hesselden promise to pay State for the material he supplied. The letter agreement was merely a request by State that Hesselden make further payments by joint checks. In view of the foregoing, we hold that the trial court was correct in determining that no direct contractual relationship existed.[5]

Nothing in *United States ex rel. Koppers Co., Inc. v. Five Boro Constr. Corp.*, 310 F.2d 701, 702 (4th Cir. 1962), indicates that in a case like the case at bar, there is a contractual relationship between the plaintiff-materialman and the defendant-prime contractor which falls within the purview of section 270b(a). In *Five Boro*, in which the materialman prevailed, appropriate notice under section 270b(a) was in fact given. *Id.* at 702. The contentions of the prime contractor and its surety in *Five Boro* that the materialman had waived the latter's rights under section 270b(a) by entering into a contractual relationship with the prime contractor were rejected by the Fourth Circuit. *Id.* at 703. Herein, as stated *supra*, it is agreed that adequate section 270b(a) notice was not given. Nor herein, as discussed *infra*, was there a contractual relationship between plaintiff and defendant.

In *United States ex rel. Hargis v. Maryland Cas. Co.*, 64 F.Supp. 522 (S.D.Cal.1946), the original written contract between the prime contractor and the subcontractor provided for the direct payments for " 'all accrued material, freight, equipment rental and transportation charges, payrolls and incidental charges to be deducted from final settlement * * *.' " *Id.* at 523. The use plaintiff, who had rented to the subcontractor a tractor and equipment, was in fact paid directly by the prime contractor who

had actual notice of the materialman's labors at the time the work was performed. The District Court concluded (at 528) that in a series of communications to the materialman, the prime contractor had "indicate[d]" that the latter interpreted its agreement with the subcontractor as its *"direct obligation to pay"* the materialman. (Emphasis in original). The District Court held that there was a direct contractual relationship between the prime contractor and the equipment renter. Herein, the facts are far different. There was no original contractual undertaking from Parker to Fordham, no notice to the prime contractor, Parker, of each delivery by Fordham to Pennington, and no indication by Parker that Parker considered it had any direct pay obligation to Fordham. At most, there was an indication of a willingness on Parker's part to cooperate with Fordham.

In *United States ex rel. Greenwald-Supon, Inc. v. Gramercy Contractors, Inc.*, 433 F.Supp. 156 (S.D.N.Y.1977), the prime contractor had agreed, in writing, while work was in progress, not to pay its subcontractor until the latter's subcontractor had been paid. The District Court concluded that there was both written notice within the meaning of section 270b(a) and also a contractual undertaking from the prime contractor to the sub-subcontractor. In the within case, Fordham first contacted Parker after Fordham had completed its delivery. Nor was there any agreement by Parker to pay Fordham. Rather, Parker only agreed to cooperate with Fordham and Pennington and in effect to pay by joint check to Pennington and to Fordham the lesser of (a) what Parker was certain it owed to Pennington or (b) what Pennington owed Fordham. In fact, Parker subsequently did issue such a joint check.

 In this case, all of the contacts between Fordham and Parker, both citizens of Maryland in the sense of 28 U.S.C.

**5.** *Accord: United States ex rel. Light & Power Util. Corp. v. Liles Constr. Co.*, 440 F.2d 474, 478 (5th Cir. 1971); *United States ex rel. Davison v. York Elec. Constr. Co.*, 184 F.Supp. 520 (D.N.D.1960). *See also United States ex rel.*

*Pomona Tile Mfg. Co. v. Kelley*, 456 F.2d 148, 151 (9th Cir. 1972); *Bowden v. United States ex rel. Malloy*, 239 F.2d 572, 578 (9th Cir. 1956), cert. denied, 353 U.S. 957, 77 S.Ct. 864, 1 L.Ed.2d 909 (1957).

§ 1332, took place in Maryland. Where the construction of the Miller Act is involved, federal not state law is involved. *F. D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974); *United States ex rel. Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.*, 479 F.2d 638, 640 n.2 (4th Cir. 1973). However, where the "construction" of the Miller Act was "not at issue and all acts relevant to the subcontract in question and its performance occurred in North Carolina," the Fourth Circuit looked to the law of that latter state "in determining the respective rights of the parties" to the subcontract. *United States ex rel. Shields, Inc. v. Citizens and Southern National Bank of Atlanta, Ga.*, 367 F.2d 473, 477 (4th Cir. 1966). In this case, there was no contractual undertaking by Parker to do more than it did, whether Maryland law or general contract law is applied. Indeed, it would seem that Parker entered into no enforceable contractual commitment to Fordham. Rather, Parker, at the very most, agreed only to cooperate to help Fordham after Fordham's services to Pennington had been concluded and while Fordham was trying to collect for the same. Even if it is assumed, *arguendo*, that Parker entered into a contract with Fordham to pay a sum jointly to Fordham and Pennington, Parker performed that commitment fully and made no promise to pay to Fordham the balance owing to Fordham by Pennington. In the absence of such a further undertaking by Parker, Fordham has no meritorious basis for asserting its claim against Parker herein for that balance.

Accordingly, judgment will be entered herein for defendants.