Leslie S. BOWDEN, Trustee in Bankruptcy for the Estate of Frank T. Hickey, Inc., Bankrupt, Twaits-Morrison-Knudsen-Macco, Morrison Knudsen Company, Inc., Macco Corporation, Ford J. Twaits Co., Ford J. Twaits, individually and as trustee, Edna M. Twaits, Jane Twaits Lataillade, Carl H. Wittenberg and Carl H. Wittenberg, Jr., as partners associated in business under the common name and style of Ford J. Twaits Co. and Fidelity & Deposit Company of Maryland, Appellants,

v.

UNITED STATES of America for the use of Emmett J. MALLOY, Appellee.

UNITED STATES of America for the use of Emmett J. MALLOY, Cross-Appellant,

v.

Leslie S. BOWDEN, trustee in bankruptcy, etc., et al., Cross-Appellees.

No. 14658.

United States Court of Appeals
Ninth Circuit.

Dec. 31, 1956.

Craig, Weller & Laugharn, Los Angeles, Cal. (Frank C. Weller, C. E. H. McDonnell, Thomas S. Tobin, Los Angeles, Cal., of counsel), for appellants Bowden and others.

McCall & McCall, Clinton R. Stevenson, Los Angeles, Cal., William P. Malloy, Inglewood, Cal., for Emmett J. Malloy.

Before FEE and CHAMBERS, Circuit Judges, and WALSH, District Judge.

WALSH, District Judge.

In September, 1951 the United States entered into a contract with appellant Twaits-Morrison-Knudsen-Macco, a joint venture,[1] (hereinafter the "prime contractor"), whereby the latter was to furnish the materials and perform the work for constructing launching facilities, utilities, and roads at the Navy Air Missile Test Center, Point Mugu, California. The initial contract amount, before change orders, was $3,661,000.00 and the prime contractor furnished a payment bond, with appellant Fidelity & Deposit Company of Maryland as one of the sureties thereon, in the sum of $1,464,400.00.[2] Under a subcontract, Frank T. Hickey, Inc., (hereinafter "Hickey"), performed a part of the work required of the prime contractor under its contract with the United States, i. e., grading, excavation, and filling. In doing such work, Hickey used earth moving and excavating equipment which it rented from appellee Malloy. Hickey began work on the Point Mugu job in September, 1951, and used Malloy's equipment from a date soon thereafter and until a very few days before the work under the subcontract was completed on October 31, 1952.

Hickey's arrangement with Malloy provided that payment of rental for the equipment would be made to Malloy thirty days after receipt of monthly invoices therefor. However, such payment program was never actually complied with. By the spring of 1952, Hickey was substantially delinquent in its payments, and the situation worsened

---

1. The joint venture is composed of two of the corporate appellants, Morrison-Knudsen Company, Inc. and Macco Corporation, and the appellant partnership, Ford J. Twaits Co.

2. The payment bond was furnished pursuant to the provisions of 40 U.S.C.A. § 270a(a) (2) and is conditioned that the prime contractor "shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract." The liability of appellant Fidelity & Deposit Company of Maryland as a surety is limited by the terms of the bond to $732,200.00.

574

during the summer months. Throughout the period, Malloy was making efforts to collect the payments which were delinquent and, in this connection, Malloy made numerous contacts with representatives of the prime contractor. These representatives assured Malloy that the prime contractor was interested in seeing that Hickey paid its bills incurred in the subcontract work and that they would do what they could to see that Hickey made payment to Malloy. On one occasion, in the summer of 1952, when it was threatened that Malloy's equipment might be removed from the Point Mugu job because of Hickey's delinquency, the prime contractor's agents asked that this action be not taken, stating that Hickey had enough funds then due it under its subcontract to enable it to pay all the bills incurred by it on the Point Mugu job which the prime contractor's agents then knew to be outstanding. The agents stated, also, that they did not propose to pay Hickey any money which they were not sure would be applied upon its indebtedness for work done under the subcontract.

3. This amount does not take into account the "subsidence" claim which the prime contractor made in Hickey's behalf and which will be referred to hereafter.

4. The letter reads:

(Letterhead of Frank T. Hickey, Inc.)

"December 12, 1952

"Twaits-Morrison-Knudsen-Macco
"449 South Beaudry
"Los Angeles 17, California
   "Attention: Mr. W. E. Coombs
"Gentlemen:
   "Confirming our conversation, we hereby authorize you to issue checks payable jointly to Frank T. Hickey, Inc. and the creditors listed below. The checks for all accounts under $1,000.00 will be in full and those having a balance larger than $1,000.00 will be in the amounts as discussed. The total so paid is to be charged against funds due Frank T. Hickey, Inc. in connection with work performed on the Launching Facilities Project and Project Building No. 4, Pt. Mugu, California.

| | |
|---|---|
| Armco Drainage and Metal Products Co. | $11,406.48 |
| Begleman, J. V. | 323.75 |
| Boedecker, F. H. | 1.31 |
| Catlin, H. | 46.67 |

In December, 1952, after the subcontract was completed, the prime contractor owed Hickey approximately $17,000.-00 [3] in retentions under the subcontract. At a meeting then held between the prime contractor's representatives and Hickey, the latter requested that the prime contractor make the retained amount available to creditors of Hickey whose claims arose out of the Point Mugu work. An understanding was arrived at in the meeting whereby, out of the retained fund, all Hickey's Point Mugu creditors whose claims were less than $1,000.00 would receive payment in full and those whose claims exceeded $1,000.00 would receive 50 per cent of their bills, checks for the payments to be drawn by the prime contractor payable to the joint order of Hickey and its respective Point Mugu creditors. As a result of the meeting, and on December 12, 1952, Hickey wrote the prime contractor a letter listing its Point Mugu creditors, including Malloy, and authorizing the prime contractor to issue checks payable to the joint payees and for the amounts agreed upon in the meeting.[4]

| | |
|---|---|
| Continental Sales and Service Co. | 11.00 |
| Crook Co. | 5,007.76 |
| Cummings Repair Service | 1,797.30 |
| Cummings, S. A. | 2,936.42 |
| Duff, Gordon | 63.15 |
| Fuller, W. P. | 76.02 |
| Galland Oilfield Service | 125.00 |
| Gridley Construction Co. | 906.49 |
| Holland, W. W. | 612.07 |
| Malloy, E. J. | 11,791.09 |
| Montalvo Rock Co. | 601.49 |
| Nicklas, R. G. | 118.13 |
| Rolls, L. M. | 38.25 |
| Saticoy Rock Co. | 57.76 |
| Terra Co. | 1,437.25 |
| Tomb Concrete Co. | 22.66 |
| Twaits-Morrison-Knudsen-Macco | 247.17 |
| United Concrete Pipe Co. | 128.10 |
| Wallace Machinery Co. | 46.43 |
| Atlas Powder Co. | 142.91 |

"We wish to take this opportunity to again express our thanks for your consideration and cooperation.

"Yours truly,
"FRANK T. HICKEY, INC.,
"/s/ By FRANK T. HICKEY
"cc: A. E. Pay"

On December 15, 1952, the prime contractor issued the checks as requested and delivered them to Hickey. On December 29, 1952, Hickey endorsed the prime contractor's check in the amount of $5,895.55 to Malloy and mailed it to him with a letter concerning the balance which Hickey believed would remain due to Malloy after the check was credited and with a letter form receipt which Hickey requested Malloy to sign and return. After modifying the form of the receipt, Malloy executed it and returned it to Hickey.

Hickey's financial condition continued to deteriorate until it filed a voluntary petition in bankruptcy and was adjudicated a bankrupt on July 30, 1953.

In the performance of the subcontract, Hickey had encountered an adverse soil condition at Point Mugu which caused it to do considerable extra work and to incur considerable extra expense. In view of this, the prime contractor on Hickey's behalf made a "subsidence" claim against the United States, which claim was allowed in December, 1953, or in January, 1954, in the amount of $29,120.00. Payment of this sum was made by the United States to the prime contractor on March 25, 1954, and the prime contractor, after deducting certain overhead charges, credited Hickey's account on its books with $27,260.00. At that time, the prime contractor owed Hickey additionally the sum of $2,298.95 for work performed at Point Mugu, so that the total credit balance in Hickey's account on the books of the prime contractor stood at $29,558.95.

To this fund of $29,558.95, claim was made by both appellant Leslie S. Bowden, the trustee in bankruptcy for Hickey's estate, and Ford J. Twaits Co., a partnership, the claim of the latter being that Hickey was indebted to it in an amount probably exceeding $58,000.00 for costs incurred on behalf of Hickey in connection with public works contracts at Saugus, California, and Santa Ana County, California.[5] On February 18, 1954, the trustee filed in the Hickey bankruptcy proceedings a petition for leave to settle his dispute with Ford J. Twaits Co. over the fund in the hands of the prime contractor on a basis whereby the trustee would accept and receive $19,705.97 of the fund in settlement of all his claims against the prime contractor and the balance of the fund would be paid to Ford J. Twaits Co. An order approving the proposed compromise was made by the referee in bankruptcy on March 30, 1954. The order directed that the $19,705.97 compromise sum would be subject in the hands of the trustee to any claims which might have been proved against it had it remained in the possession of the prime contractor and subject, also, to any claims which might be proved against the prime contractor under the Miller Act[6] by suppliers to Hickey of labor and materials on the Point Mugu job.

On February 23, 1954, the present action was instituted by Malloy in the district court against all of the appellants other than Trustee Bowden. The complaint sought recovery on the payment bond under the Miller Act of $6,027.45, with interest, Malloy alleging that he had direct contractual relationship with both Hickey and the prime contractor. The complaint asked, also, that an equitable lien to secure payment of Malloy's claim be impressed upon the proceeds of the "subsidence" claim then in the hands of the prime contractor. Malloy moved in the district court on April 9, 1954, for a preliminary injunction enjoining the prime contractor and its surety, pending final determination of Malloy's action, from paying to the trustee in bankruptcy, or any other person, any funds in their possession belonging to Hickey for work done by it at Point Mugu, unless the parties enjoined should retain $6,789.42 of the funds subject to the order of the district court. Immediately following presentation of Malloy's motion,

---

5. None of the indebtedness claimed by Ford J. Twaits Co. grew out of Hickey's work at Point Mugu.

6. §§ 270a–270d, Title 40, U.S.C.A.

the district court issued a temporary restraining order, effective pending hearing of the motion for a preliminary injunction, giving to Malloy the relief sought by its motion. In view of the restraining order, the prime contractor paid to Hickey's trustee only $12,916.54 of the settlement sum and retained $6,789.42 subject to the further order of the court; and although the district court upon hearing Malloy's motion denied the preliminary injunction and quashed the restraining order, the prime contractor continued to hold the $6,789.42 at the time of trial. Before trial, Hickey's trustee intervened and filed an answer as a defendant in the action, pursuant to stipulation of all parties.

Upon the trial, Malloy learned for the first time of Hickey's letter of December 12, 1952, to the prime contractor.[7] The district judge found that the letter was written notice to the prime contractor given within ninety days from the date on which Malloy furnished and supplied to Hickey the last of the labor and materials for which Malloy was making claim, and that the letter stated with substantial accuracy the amount claimed by Malloy and named Hickey as the party to whom the labor and material had been supplied. The district court then concluded, as a matter of law, that the letter fulfilled the requirements of 40 U.S.

C.A. § 270b(a) [8] and that, although Malloy had a direct contractual relationship with Hickey but no contractual relationship, express or implied, with the prime contractor, Malloy was entitled to judgment against the prime contractor, the respective joint venturers, and their surety for $5,895.54, plus interest and costs. In the course of the trial, the district judge ruled as a matter of law that Malloy had no equitable lien on the fund in the prime contractor's possession.

Judgment having been entered in the district court in favor of Malloy pursuant to the findings and conclusions of the trial judge, appellants prosecute their appeal on the ground that Malloy did not give a sufficient notice to the prime contractor to enable him to bring suit on the payment bond in view of the provisions of 40 U.S.C.A. § 270b(a). The cross-appeal questions the correctness of the amount of the judgment granted below and, in addition, claims error in the district court's denial of the injunction sought by appellee and in its refusal to adjudge and enforce the equitable lien claimed by appellee.

■ As pointed out above, the district judge concluded that Malloy had a direct contractual relationship with Hickey but no contractual relationship, express or implied, with the prime con-

---

7. The letter is reproduced in full in footnote 4.

8. "(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: *Provided, however*, That any person having direct contractual relationship with a subcontractor but no contrac-

tual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Such notice shall be served by mailing the same by registered mail, postage prepaid, in an *envelop* addressed to the contractor at any place he maintains an office or conducts his business, or his residence, or in any manner in which the United States marshal of the district in which the public improvement is situated is authorized by law to serve summons."

tractor. In view of this conclusion, it followed that Malloy could have a right of action upon the payment bond only if he had given written notice to the prime contractor as provided in the statute. Thus, the large question presented by the appeal in the case is: Was the letter of December 12, 1952, from Hickey to the prime contractor "notice" under the provisions of 40 U.S.C.A. § 270b(a)? We hold that it was not.

We think the teaching of the cases [9] which have dealt most soundly with questions regarding the sufficiency of notice when it is required to be given by Section 270b(a) may be fairly summarized as follows: The giving of the written notice specified by the statute is a condition precedent to the right of a supplier to sue on the payment bond; the writing must be sent or presented to the prime contractor by or on the authority of the supplier; and the writing must inform the prime contractor, expressly or by implication, that the supplier is looking to the contractor for payment of the subcontractor's bill. Here there are plainly lacking some of the requisites of a notice sufficient under the rules just stated. There was, of course, no writing sent or presented by Malloy to the prime contractor. The letter from Hickey was certainly not sent or presented on Malloy's authority because Malloy did not even know of its existence until the trial. Finally, nothing in the letter would inform the prime contractor that Malloy expected it to pay Hickey's bill.

The appellee asserts, correctly enough, that the Miller Act is remedial in nature and entitled to a liberal construction in order to effectuate the legislative intent to protect those whose labor and materials go into public projects. He then argues that since the letter from Hickey gave the prime contractor all the information which it would have obtained if Malloy had given it the written notice provided by the statute, the principle of "liberal construction" requires that we hold the latter notice was unnecessary. But this argument goes too far, too fast. It overlooks entirely the fact that the statute makes the requirement of written notice from the supplier a condition precedent to a right of action on the bond; and no rule of liberality in construction can justify reading out of the statute the very condition which Congress laid down as prerequisite to the cause of action.[10]

It cannot be doubted that one purpose of Congress in enacting the Miller Act was the protection of laborers and materialmen. But it is clear, too, we think, from the mechanics provided in the Act for its operation and the accomplishment of its purpose, that it was the intent of Congress to fix a time limit after which the prime contractor could make payment to the subcontractor with certainty that he would not thereafter be faced by

9. Fleisher Engineering & Construction Co. v. United States for Use and Benefit of Hallenbeck, 1940, 311 U.S. 15, 61 S.Ct. 81, 85 L.Ed. 12; United States for Use and Benefit of American Radiator and Standard Sanitary Corp. v. Northwestern Engineering Co., 8 Cir., 1941, 122 F.2d 600; United States for Use of Bruce Co., Inc., v. Fraser Construction Co., D. C.W.D.Arkansas, 1949, 87 F.Supp. 1; United States for Use of Birmingham Slag Co. v. Perry, 5 Cir., 1940, 115 F.2d 724; Coffee v. United States for Use and Benefit of Gordon, 5 Cir., 1946, 157 F.2d 968; United States for Use and Benefit of Franklin Paint Co., Inc., v. Kagan, D. C.Mass.1955, 129 F.Supp. 331.

10. Cf. Clifford F. MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., 1944, 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163, 1167. We are aware that Houston Fire and Casualty Insurance Co. v. United States for Use and Benefit of Trane Company, 5 Cir., 1954, 217 F.2d 727 is contra, but we do not consider the case soundly decided and, accordingly, do not follow it. The court in its opinion in that case expressed misgivings about holding the supplier entitled to recover on the bond although he had given no written notice to the prime contractor, but cited Coffee v. United States for Use and Benefit of Gordon, supra, footnote 9, as requiring such holding. Oddly, Coffee did not hold that written notice to the price contractor was unnecessary, but, in fact, pointed out, 157 F.2d at page 969, that no case up to that time had so held.

claims of those who had supplied labor and materials to the subcontractor. It is not consistent with either this intent or the mechanics of the statute if a prime contractor is required to choose between withholding payment to his subcontractors indefinitely or acting on peril of learning thereafter that some writing, by some person, located somewhere in his files, contains sufficient information regarding accounts between a supplier and the subcontractor to render him liable for the subcontractor's bill. A brief letter from the supplier to the prime contractor will make certain and unambiguous the rights and liabilities of all concerned—the supplier, the prime contractor, and the surety. We do not believe that Congress intended to have it held that such little expenditure of effort is too much diligence to require of a supplier in order that he may secure his right of action on the payment bond.[11]

Appellee says in his brief that even though it be found that no sufficient notice under the statute was given, the judgment below must be upheld because there was a direct contractual relationship between Malloy and the prime contractor, which the district court should have found and which rendered notice unnecessary. However, no effort is made by the appellee in his brief to point out the evidence in the record which required the district court to find such contractual relationship. We have ourselves examined the entire record and find no error in the district court's conclusion that Malloy had no contractual relationship, express or implied, with the prime contractor.

Appellee contends, further, that the giving of the statutory notice is necessary only as a condition to a right of action against the surety; that the provisions of the contract with the United States and the provisions of the pay-

ment bond both make the prime contractor liable to Hickey's suppliers without any notice; and that, consequently, the judgment below must be upheld as against the prime contractor. Insofar as these contentions are based upon the provisions of the contract, they have no merit. Sternberg Co., Inc., v. State National Bank of Texarkana, 5 Cir., 1934, 69 F.2d 759, 760; Gallaher & Speck, Inc., v. Ford Motor Company, 7 Cir., 1955, 226 F.2d 728, 731; United States for Use of Birmingham Slag Co. v. Perry, 5 Cir., 1940, 115 F.2d 724, 725. And insofar as appellee relies upon the provisions of the bond, the contentions are likewise without merit. The statute providing the cause of action on the bond, 40 U.S.C.A. § 270b(a), makes no distinction between the liability of the contractor and that of his surety. Recovery can be had against neither unless the condition precedent to the existence of the right of action—the giving of the statutory notice—has been complied with.

Malloy contended below that, as an unpaid supplier of labor and material which was incorporated into the work done under the contract with the United States, an equitable lien existed in his favor upon the funds in the hands of the prime contractor which had been paid by the United States in settlement of the "subsidence" claim. The district judge in the course of the trial ruled adversely to Malloy on this proposition and, in the cross-appeal, this ruling is claimed to be erroneous. We hold that the ruling of the district judge was correct. Bank of Arizona v. National Surety Corporation, 9 Cir., 1956, 237 F.2d 90; In re Flotation Systems, Inc., D.C.1946, 65 F.Supp. 698.

The judgment is reversed and the cause remanded to the district court with directions to enter judgment that appellee take nothing by the complaint, with costs to appellants.

11. "One protected by the bond must be vigilant in the prosecution of his rights thereunder or take the chance of finding the bond depleted by the executions of those more prompt than he, or perhaps find the door entirely closed against his suit by limitation. 'Equity aids the vigilant'." H.Rep. No. 1263 (74th Cong., 1st Sess.)