United States Court of Appeals,

Eleventh Circuit.

No. 94-5084.

MACCAFERRI GABIONS, INC., Plaintiff-Appellee, Cross-Appellant,

v.

DYNATERIA INC., Moore & Artis, Ltd., Inc., et al. Defendants,

Wilkinson & Jenkins Construction Co., Inc., Ohio Casualty
Insurance Company, Defendants-Appellants, Cross-Appellees,

Robert E. Rupert, Third-Party-Defendant.

Aug. 20, 1996.

Appeals from the United States District Court for the Southern
District of Florida. (No. 88-14152-CIV-KMM), K. Michael Moore,
Judge.

Before TJOFLAT, Chief Judge, and RONEY and PHILLIPS[*], Senior
Circuit Judges.

PHILLIPS, Senior Circuit Judge:

Maccaferri Gabions, Inc. (Maccaferri), a materialman, sued

general contractor Wilkinson & Jenkins Construction Co., Inc. (W &

J) and its surety, The Ohio Casualty Insurance Co., for the balance

due on materials Maccaferri had supplied on a federal construction

project. The jury found for Maccaferri on three of its claims—one

based on the Miller Act, 40 U.S.C. §§ 270a-270d (1986), one on a

third-party beneficiary theory, and one on promissory estoppel—and

the district court then denied W & J and Ohio Casualty's motions

for judgment as a matter of law on each of these claims. W & J and

Ohio Casualty now appeal the denial of these motions, as well as

the district court's award of prejudgment interest on each of

---

[*]Honorable J. Dickson Phillips, Jr., Senior U.S. Circuit
Judge for the Fourth Circuit, sitting by designation.

Maccaferri's successful claims. Maccaferri also cross-appeals, seeking an increase in the interest award. We conclude that the lower court erred in denying each of W & J's and Ohio Casualty's appealed Rule 50(a) motions, and we therefore reverse and remand with directions to enter judgment for W & J and Ohio Casualty on all the claims.

I.

This dispute arises out of a shoreline erosion-control project undertaken by the Army Corps of Engineers at Lake Okeechobee, Florida. In 1986, W & J bid for and was awarded the general contract for Section 5 of the project, which involved two large areas on the lake's south shoreline as well as a small test section. Ohio Casualty issued payment and performance bonds for the project.

W & J sub-contracted with Maccaferri after it received the general contract. Maccaferri manufactures gabions, which are stone-filled wire mesh baskets used in erosion control and other earth-retention projects. The general contract required W & J to use gabions to complete a test section of the project, and it installed Maccaferri's gabions in that section. Maccaferri was paid in full for those materials; no claims arise out of that transaction.

In early 1987, Maccaferri again approached W & J regarding the remaining work on the project. Maccaferri suggested that W & J subcontract some of that work to Moore & Artis (M & A), a contractor with whom Maccaferri previously had dealt. Maccaferri further offered to supply M & A with reduced-price gabions, which

it could use to complete the rest of the project. Maccaferri claims that, at a meeting in Tampa attended by representatives of all three parties, both W & J and M & A agreed to use its gabions for all the remaining work; W & J denies ever making such a promise.

Whatever happened, W & J did contract with M & A to do work on the project. Section 3 of their subcontract required W & J to make monthly progress payments to M & A, but specified that those payments would not be due until five days after the Corps had paid W & J for that month's work. M & A also delivered performance and payment bonds to W & J; the sureties on those bonds were James Sugg and Ruben Ham. Another contractor, Dynateria, Inc., who had located these individual sureties, entered into separate contracts by which it, in turn, agreed to indemnify them.

In April of 1987, M & A ordered $574,304.64 worth of gabions from Maccaferri. Maccaferri agreed to supply the gabions, intending to deliver them in installments. In anticipation of performance, Maccaferri procured and stored the high-strength wire needed to make the mesh baskets, and it further began re-engineering its production line to produce the extra-large gabions needed for the project.

Because of the large size of this order and because Maccaferri was unsure of M & A's creditworthiness, Maccaferri approached W & J and asked it to directly guarantee M & A's payments on the order. W & J refused this request. But, to accommodate Maccaferri, W & J and M & A did eventually modify their subcontract to "allow payment by [W & J] for materials delivered to and provided on the Project

by Maccaferri ... by bank checks payable to [M & A's escrow agent] Edward W. Bowen, Jr. and Maccaferri ... and to be distributed to Maccaferri."

Reassured by this arrangement, Maccaferri delivered on June 2 what was supposed to be the first of several shipments of gabions, for which it billed M & A $132,226.16. When M & A notified it of this charge, W & J included a portion of this fee in its June expense estimate, which it forwarded to the Corps. Although most of the gabions had not yet been incorporated into the project so that the Corps was not contractually bound to pay W & J for their inclusion, the Corps, in its discretion, paid W & J $74,722 of the total billed to M & A for the gabions. W & J, in turn, issued a joint check for the same amount made out to Maccaferri and Bowen. W & J mailed the check to Bowen, who endorsed and forwarded it to Maccaferri.

Under the terms of its agreement with Maccaferri, M & A was supposed to pay for any gabions delivered to the site within thirty days of their delivery. Because it still had not received full payment for its June 2 delivery by July 24, Maccaferri sent M & A a collection letter requesting full payment of the balance due on its account; it also sent a copy of that letter to W & J.

By mid-August it became apparent that M & A was in serious trouble, and, after M & A failed to meet its August payroll, W & J declared them to be in default and asked their surety, Dynateria, to step-in and complete M & A's work. During the same month, W & J prepared its July expense estimate, in which it included the balance due on the delivered gabions. But the Corps representative

with whom W & J discussed this expense said that the Corps would make no more payments for gabions that had not yet been incorporated into the project until it received notice that Maccaferri had been paid for them.

In October, Dynateria and W & J entered into a new subcontract under which Dynateria would take over M & A's contractual obligations. The W & J/Dynateria subcontract contained the following language:

> The Contractor [W & J] agrees to pay the Subcontractor [Dynateria] for the performance of this Subcontract ... subject to payments previously made to [M & A] for work under its Subcontract, and further subject to reimbursement to Contractor for labor costs advanced [M & A] ..., and payment to Maccaferri Gabions, Inc. in the sum of $57,226.00 for materials delivered and provided on the project for [M & A].

In January of 1988, Dynateria promised Maccaferri that it would pay the remaining balance due and complete the project using only gabions. Unfortunately, Dynateria did neither, and it formally defaulted in October of 1988. W & J then completed the project itself using rip-rap instead of gabions. Meanwhile, Maccaferri was never paid the balance due on its June, 1987 shipment, nor were a large portion of those gabions ever incorporated into the project. As a result, the Corps never paid W & J for those stored gabions.[1]

Maccaferri began this suit in June of 1988. During the following eight months, Maccaferri twice amended its complaint to add various claims and defendants. By February of 1989, it had

---

[1]In fact, the Corps eventually back-charged W & J for about $33,000 of the $74,722 it had advanced in July of 1987, because many of the gabions for which this advance had paid were never used in the project.

included W & J, Ohio Casualty, Dynateria, M & A, and certain individual sureties as defendants. Against all defendants, Maccaferri alleged breach of contract, promissory estoppel, negligence and gross negligence, conversion, and Miller Act claims.[2]

In July of 1989, Maccaferri moved for a preliminary injunction, asking that W & J be forbidden to complete the project without using gabions. The preliminary injunction was denied. After the injunction hearing, Maccaferri filed its third amended complaint, and in the months that followed, the parties filed numerous summary judgment motions. Eventually, Maccaferri, by various means, obtained judgments against M & A, Dynateria, and some individual sureties.

When the smoke had cleared, Maccaferri went to trial against only W & J on the claims of breach of contract, promissory estoppel, conversion, and the Miller Act claim—on which Ohio Casualty also remained a defendant. The jury found for W & J on the conversion and direct breach of contract claims, but found for Maccaferri on its third-party beneficiary breach of contract, promissory estoppel, and Miller Act claims, and awarded damages as follows: $57,226.16 for the Miller Act claim; $57,226.16 for the third-party beneficiary claim; and $45,800.00 for the promissory estoppel claim.[3] The district court also awarded simple

---

[2]Maccaferri further alleged breach of suretyship contract against the sureties.

[3]Although the parties do not discuss this point, we assume that the identical awards for the third-party beneficiary and Miller Act claims were intended to cover the same loss—namely the uncollected balance due on the June 2 delivery—and that

prejudgment interest of 5.49%, which, it concluded, began accruing on July 2, 1987. Thus the district court awarded $48,878.98 interest on both the Miller Act and third-party beneficiary claims, and $39,119.47 interest on the promissory estoppel claim.

These appeals followed, with W & J and Ohio Casualty challenging the judgments against them[4] and Maccaferri challenging the district court's failure to award compound interest on those judgments.

## II.

W & J first argues that the district court erred in failing to grant its motion for judgment as a matter of law and thereby dismiss Maccaferri's Miller Act claim. Specifically, W & J contends that because Maccaferri failed to provide it with appropriate notice of its claim for payment within the Act's ninety-day period, *see* 40 U.S.C. § 270b(a), the district court should have directed judgment against Maccaferri on this claim. We agree that W & J never was appropriately notified of Maccaferri's claim; accordingly, we reverse.

In reviewing denials of motions for judgment as a matter of law, we apply the same standard applied by the district court, asking whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that a reasonable jury could not arrive at a contrary verdict." *Johns v. Jarrard,* 927 F.2d 551,

---

Maccaferri could only have recovered this amount once.

[4]Because Ohio Casualty's liability is entirely contingent on W & J's, it makes no independent arguments. Thus our discussion will deal only with W & J's arguments and the determinative question of its liability.

557 (11th Cir.1991).  In applying that standard we view all the evidence in the light most favorable to Maccaferri as non-movant.

We conclude that under that standard, the evidence was insufficient to establish that Maccaferri satisfied the Miller Act's notice requirement.  Under the Miller Act, materialmen on government construction projects who have no direct contractual relation with the general contractor must, in order to establish a right of action against the general contractor's payment bond, give the general contractor sufficient written notice of their claims within ninety days of the last day on which they supplied material for the project.  § 270b(a).[5]

Although courts have been somewhat lenient about enforcing the Act's requirements concerning the *method* by which such notice is given, *e.g. Fleisher Engineering & Construction Co. v. United States ex rel. Hallenbeck,* 311 U.S. 15, 18-19, 61 S.Ct. 81, 83, 85 L.Ed. 12 (1940) (notice sufficient though not sent, as Act requires, via registered mail), they have interpreted more rigidly the Act's requirements for the *contents* of that notice:  "[I]t is crucial that the notice state a claim directly against the general contractor, that the claim be stated with some specificity of

---

[5]In relevant part, § 270b provides:

> [A]ny person having direct contractual relationship with a subcontractor but no contractual relationship ... with the [general] contractor ... shall have a right of action upon the [general contractor's] payment bond upon giving written notice to said [general] contractor within ninety days from the date on which such person ... supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished.

amount due, and that the claim specify the subcontractor allegedly in arrears."  *United States ex rel. Jinks Lumber Co. v. Federal Ins. Co.,* 452 F.2d 485, 488 (5th Cir.1971).  Put another way,

> [T]he written notice and accompanying oral statements must inform the general contractor, expressly or impliedly, that the supplier is looking to the general contractor for payment so that "it plainly appears that the nature and state of the indebtedness was brought home to the general contractor."

*United States ex rel. Kinlau Sheet Metal Works v. Great Am. Ins. Co.,* 537 F.2d 222, 223 (5th Cir.1976) (quoting *Houston Fire & Cas. Ins. Co. v. United States ex rel. Trane Co.,* 217 F.2d 727, 730 (5th Cir.1954)).  This strictness as to the contents of the notice is driven by the purpose of the notice requirement itself, which is to protect the general contractor by fixing a date beyond which, absent notice, it will not be liable for the subcontractor's debts. *Id.* at 223-24 n. 1.

Here, the parties do not dispute the underlying facts;  but they disagree as to whether Maccaferri's actions within the statutory period constitute adequate notice under the Act.  The parties agree that Maccaferri last supplied gabions to M & A on June 9, 1987.  Accordingly, it had until September 7 to notify W & J of its claim.

Maccaferri points to several occurrences during the statutory period and claims that each one, and all of them by their combined force, put W & J on notice of its claim.  Maccaferri first argues that its June 24 collection letter to M & A, a copy of which it sent to W & J, satisfied the notice requirement.  The letter was addressed to M & A and was to the point:

> Our idea of a good collection letter is that it should be brief, friendly, and successful.  This letter is brief,

friendly, and it's [sic] success depends on you.  The amount past due is $132,226.16.  Thank you.

We conclude that sending a copy of this letter to W & J was insufficient under § 270b(a) to inform W & J that Maccaferri was asserting a claim directly against it.  *Kinlau* is instructive on this point.  In that case, a supplier mailed the general contractor monthly statements showing the amount the subcontractor owed it.  It also eventually mailed the general contractor a copy of a collection letter it had sent to the subcontractor.  The district court held that neither the monthly statements nor the copied collection letter constituted sufficient notice to the general contractor under § 270b(a) and on appeal, the Fifth Circuit specifically affirmed this determination.  *Kinlau,* 537 F.2d at 224.

Here, as in *Kinlau,* a collection letter addressed to the subcontractor, M & A, though copied to general contractor W & J, did not notify W & J that Maccaferri was looking to it for payment of M & A's debt.  Accordingly, the copied collection letter was legally insufficient to satisfy the Act's notice requirement.  *See id.*

Maccaferri next claims that the joint-check arrangement between W & J and M & A also constituted sufficient statutory notice to W & J.  Specifically, Maccaferri claims that three different aspects of this arrangement—separately and together—satisfy the notice requirement.  First, it suggests that the existence of the agreement itself put W & J on notice that Maccaferri would be looking to it for its payments.  Second, Maccaferri claims that W & J's and M & A's modification of their subcontract to permit the joint checks put W & J on notice.  Third,

Maccaferri suggests that actual payment via joint check constituted notice.

These arguments are meritless. First, as several courts have specifically held, a joint-check arrangement between a general contractor and its subcontractor does not by nature constitute Miller Act notice to the general that an unpaid materialman is making a specific claim for payment. *United States ex rel. San Joaquin Blocklite v. Lloyd E. Tull, Inc.,* 770 F.2d 862, 865 n. 4 (9th Cir.1985); *Bowden v. United States ex rel. Malloy,* 239 F.2d 572, 577 (9th Cir.1956); *United States ex rel. Brothers Builders Supply v. Old World Artisans,* 702 F.Supp. 1561, 1567 (N.D.Ga.1988); *United States ex rel. Fordham v. P.W. Parker, Inc.,* 504 F.Supp. 1066, 1070 n. 3 (D.Md.1980).[6] Accordingly, W & J's and M & A's modification of their own subcontract to reflect the joint-check agreement must also fail to supply the requisite notice. Furthermore, the actual issuance of joint checks does not provide any more notice than the joint-check arrangement itself. *See*

---

[6]In *United States ex rel. Light & Power Utilities Corp. v. Liles Construction Co.,* 440 F.2d 474 (5th Cir.1971), the court flirted with the joint-check question presented here in holding that a joint-check arrangement does not create a direct contract between the general and the materialman. This is significant, because, under the Act, the existence of a direct contractual relationship obviates any need for notice. Although *Liles* certainly offers implicit support for the idea that a joint-check arrangement does not constitute notice—otherwise, it would not matter whether it created a direct contractual relationship or not—it does not specifically address the notice requirement. *See also United States ex rel. State Electric Supply v. Hesselden Constr. Co.,* 404 F.2d 774 (10th Cir.1968) (neither joint-check arrangement itself nor the issuing of joint checks establishes direct contract relationship between the general and the materialman; no discussion of notice). Here, neither party contends that the joint-check arrangement created a direct contractual relationship between W & J and Maccaferri.

*Bowden,* 239 F.2d 572 (no notice despite issuance of joint checks). Thus, no aspect of the joint-check arrangement provided W & J with the required notice of Maccaferri's claim.

The final event that Maccaferri suggests could constitute Miller Act notice is W & J's preparation of its monthly payment estimate for July of 1987, in which it took account of the delivered gabions. Maccaferri contends that W & J's preparation of this estimate somehow suggests it had Miller Act notice of its claims. We disagree, and conclude, as did the Eighth Circuit in *United States ex rel. American Radiator & Standard Sanitary Corp. v. Northwestern Engineering Co.,* 122 F.2d 600, 603 (8th Cir.1941), that a supplier's submission of invoices that ultimately were incorporated into the general's payment estimate do not, without more, constitute notice under § 270b(a). Because a general's mere awareness of a materialman's outstanding charges against its subcontractor does not automatically notify the general that the materialman is looking to *it* for payment, we believe the Eighth Circuit's position is sound. Accordingly, we conclude that W & J's use of Maccaferri's invoices in compiling its payment estimate did not somehow amount to notice of its claims under § 270b(a).

Finally, Maccaferri urges that the "confluence of circumstances" present here—the collection letter, the joint check arrangement and payment, and the payment estimate—all combine to at least raise a jury question as to whether W & J received proper notice. We disagree. What is missing here is exactly what § 270b(a) was meant to provide: a clear indication from the materialman that it expects the general contractor to pay the

balance due on the subcontractor's debt. *See Jinks Lumber,* 452 F.2d at 488 (prescribing content of § 270b(a) notice). Accordingly, we conclude that there is no evidence from which a rational jury could have concluded that Maccaferri satisfied the Miller Act's notice requirement, *see* Fed.R.Civ.P. 50(a). The district court therefore erred in not granting W & J's motion for judgment as a matter of law as to Maccaferri's Miller Act claim.

### III.

W & J next argues that the district court erred in failing to grant its Rule 50(a) motion as to Maccaferri's claim that it was a third-party beneficiary of W & J's subcontracts with M & A and Dynateria. Because we conclude that, as a matter of Florida law, Maccaferri could not recover as a third-party beneficiary of either contract, we agree with W & J and, accordingly, reverse as to that claim.

As explained above, Maccaferri's third-party beneficiary claims were based on two of W & J's subcontracts, those with M & A and Dynateria. We will examine these separately.

### A.

We look first at the W & J subcontract with M & A, which requires that we consider both the original subcontract and the joint-check agreement by which the parties partially modified the original. Maccaferri argues that by virtue of the modification, W & J assumed M & A's duty to pay Maccaferri directly for all materials it delivered to the job site. But W & J argues that, when read together, the two documents merely constitute a standard joint-check agreement, whereby the parties allowed W & J to pay

that portion of M & A's charges attributable to Maccaferri's gabions via a joint check made out to both Maccaferri and M & A's escrow agent, Bowen.

We approach this question by looking first to basic rules of contract construction. Under Florida law, as generally, where the language of an agreement is unambiguous, the legal effect of that language is a question of law and, as such, may be declared by the court. *Smith v. State Farm Mutual Automobile Ins. Co.,* 231 So.2d 193, 194 (Fla.1970); *Orkin Exterm. Co. v. F.T.C.,* 849 F.2d 1354, 1360 (11th Cir.1988). But, where a contract is reasonably susceptible to more than one interpretation, it is ambiguous and its meaning is a question for the jury. *Hoffman v. Terry,* 397 So.2d 1184 (Fla.Dist.Ct.App.1981); *Thunderbird Ltd. v. First Fed. Sav. & Loan Ass'n,* 908 F.2d 787, 790 (11th Cir.1990); *Fabrica Italiana Lavorazione Materie Organiche v. Kaiser Aluminum & Chem. Corp.,* 684 F.2d 776, 780 (11th Cir.1982). The initial question whether a contract is or is not ambiguous is itself one of law. *Orkin,* 849 F.2d at 1360; *see* 10A Charles A. Wright et al., *Federal Practice & Procedure* § 2730.1 at 279 (1983) (stating rule in context of summary judgment). Here, we conclude that on the matter at issue, the relevant documents are, as a matter of law, unambiguous, hence should have been, and may now be interpreted as a matter of law.

Section 3 of the original W & J/M & A subcontract defined those parties' relationship with respect to W & J's payments on the subcontract. It provided, *inter alia,* for W & J to make monthly progress payments to M & A during the course of its performance.

But it expressly limited W & J's payment duties as follows:

> Such [progress] payments shall not become due to [M & A] until 5 days after [W & J] receives payment for such work from the Owner.  If [W & J] receives payment from the Owner for less than the full value of materials delivered to the site but not yet incorporated into the work, the amount due to [M & A] on account of such materials delivered to the site shall be proportionately reduced.

Later, W & J and M & A partially modified this agreement "to allow payment by [W & J] for materials delivered to and provided on the Project by Maccaferri" by joint checks payable to Maccaferri and M & A's escrow agent, Bowen.  The joint-check modification incorporated by reference the original subcontract;  thus, we must construe the two documents together, giving effect, where possible, to all their provisions.  *See Guaranty Fin. Servs. v. Ryan,* 928 F.2d 994, 999-1000 (11th Cir.1991) (" "An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions meaningless' ") (quoting *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983)).

In determining whether these documents, read together, are ambiguous, we first ask whether they are "reasonably susceptible" to Maccaferri's suggested reading—that by them W & J undertook an independent obligation to pay it directly for materials it supplied to M & A.  We conclude that the documents cannot support such a reading for several reasons.  First, Maccaferri's reading conflicts with other contract provisions that establish the parties' relative duties.  Under Section 11(c) of the main subcontract, M & A expressly "obligates" itself "[t]o pay for all materials furnished ... under this subcontract."  Similarly, Section 12 provides that M & A

> shall furnish to [W & J] releases of bond rights and lien rights by persons who have furnished ... material ... in the performance of this Subcontract, it being agreed that payment of money otherwise due [M & A] need not be made by [W & J] until such releases are furnished.

Thus the main subcontract clearly requires M & A, not W & J, to pay materialmen such as Maccaferri, even allowing W & J to withhold payment from M & A if it has not secured releases from those materialmen. Thus reading the joint check agreement as Maccaferri suggests would create a conflict between that agreement and these sections of the contract; such a reading is strongly disfavored, *see Guaranty Financial,* 928 F.2d at 1000 (" "nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible' ") (quoting *Johnson Controls,* 713 F.2d at 1555).

Maccaferri's reading would further alter W & J's obligations under its subcontract with M & A by erasing, though only with respect to Maccaferri, important limits on those obligations. Specifically, under Section 3, which defines W & J's payment obligations under the subcontract, W & J is only obligated to make progress payments or final payments to M & A after it has itself received the appropriate payment from the Corps. But Maccaferri's suggested interpretation would read this limitation out of the modified contract, at least with respect to itself, requiring W & J to pay for it directly for materials whether or not the Corps already has paid W & J for them.

Finally, although the parties could have used the joint-check arrangement specifically to supersede conflicting provisions of the subcontract, the text of the joint-check agreement contains no

language effecting such a change.  Most critically, the joint-check language itself is non-mandatory;  it does not say, for example, "W & J shall hereafter assume M & A's duty to pay all money owing to Maccaferri for its deliveries to the project, all other provisions of the Subcontract notwithstanding."  It says rather that the parties "agree to allow," not require, W & J to pay by joint check for Maccaferri's charges.  This is hardly language that signals a thoroughgoing change in the parties' duties.  Accordingly, we conclude that these agreements do not support Maccaferri's suggested reading.  We further conclude that the only reasonable reading of these documents, one which gives effect to all their terms, is as follows:  As W & J's duty to pay M & A accrued under the subcontract—*i.e.,* as it received the appropriate payments from the government—it could pay for that portion of M & A's fee attributable to Maccaferri's materials by joint check made out to Maccaferri and Bowen.[7]

Having determined the meaning of the contract language in question, we must now determine whether that language creates in Maccaferri any presently-enforceable third-party rights against W & J.  We conclude that it does not.

---

[7]We note that the parties acted on this agreement as it applied to charges due in June of 1987.  In that month W & J presented to the government its payment estimate, which requested payment for M & A's charges, $74,947.98 of which was attributable to gabions Maccaferri had delivered to the site.  The government paid this request in full, and after receiving this payment, W & J issued a check payable to Bowen and Maccaferri for this amount. Bowen endorsed the check and forwarded it to Maccaferri.  Thus, as W & J's duty to pay M & A was activated by its own receipt of funds from the government, W & J—as allowed by the joint-check arrangement—paid a portion of those funds by joint check, the proceeds of which ultimately were distributed to Maccaferri.

Under Florida law, a third party may enforce an agreement between others only if it is an intended beneficiary, not an incidental beneficiary, of that agreement. *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 279 (Fla.1985). Furthermore, "[a] party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party." *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.,* 647 So.2d 1028, 1031 (Fla.Dist.Ct.App.1994). There can be no doubt that this agreement did bestow *some* benefit on Maccaferri; by agreeing to allow payments in the form of joint checks, the parties gave Maccaferri greater assurance that it would actually receive whatever funds W & J gave M & A to pay for Maccaferri's materials. Although it is unclear whether this benefit was "primary" or "direct" enough under Florida law to make Maccaferri a true third-party beneficiary of this contract, we assume—only arguendo—that the agreement did create a third-party beneficiary arrangement.

But as a third-party beneficiary of the W & J/M & A subcontract, Maccaferri's rights against W & J not only sprang from that agreement, but also were limited by its terms. To that effect, Florida has announced the following rule: "It is clear that a third-party beneficiary's right to enforce a contract cannot "rise higher than the rights of the contracting party through whom he claims.' " *Maryland Casualty Co. v. Department of Gen. Servs.,* 489 So.2d 54, 57 (Fla.Dist.Ct.App.1986) (quoting *Crabtree v. Aetna Casualty & Surety Co.,* 438 So.2d 102, 105 (Fla.Dist.Ct.App.1983)); *see also* 11 Fla.Jur.2d *Contracts* § 153, at 462 (1981) (stating this

general rule).

Based on this rule, W & J argued at trial and again on appeal that Maccaferri could not, as a matter of law, recover against it as a third party beneficiary. It points out that, as explained above, M & A's right to receive progress payments for a period did not accrue until *after* the government paid W & J the money due for that period. Furthermore, the undisputed testimony at trial was that, after paying W & J's June estimate, the government made no more payments attributable to Maccaferri's gabions.[8] In fact, the government eventually back-charged W & J $33,000 for gabions included in the June payment that never were incorporated into the project. Thus, because the government never paid W & J for the balance of the delivered gabions, W & J's duty to pay for them—hence M & A's corresponding right to be paid for them—never matured. As a result, Maccaferri's own right to look to W & J for payment, which could be no greater than M & A's, *see Maryland*

_____

[8]When W & J prepared its July payment estimate, it originally requested payment for the balance due Maccaferri. According to the trial testimony of W & J's co-owner, William Wilkinson, when W & J spoke with a Corps representative regarding whether the Corps would pay for these gabions, which were on site but had not been incorporated into the project, the representative explained that the Corps would make no more payments for such materials without first receiving proof that Maccaferri already had been paid for them.

It appears that the Corps was concerned about releasing any more funds for stored materials without being certain that those materials would in fact be used in the project. The Corps seems to have reasoned that if someone performing the job had itself paid for the materials, it would be much more likely to actually use them on the job. At any rate, because neither M & A nor Dynateria ever paid Maccaferri for these materials, Wilkinson explained, W & J never received a payment notice that it could forward to the Corps. As a result, the Corps never released funds to cover the gabions that had been delivered, but not installed.

*Casualty Co.,* 489 So.2d at 57, also never matured.

We agree with this analysis.  Thus, to the extent that the W & J/M & A subcontract, including the joint-check agreement, created any third-party rights in Maccaferri, the limits those very agreements placed on its rights prohibit Maccaferri from recovering against W & J the unpaid balance due on the gabions it delivered.

### B.

The other contract from which Maccaferri might have gained third-party rights is the subcontract between W & J and Dynateria. We conclude that this contract gave Maccaferri no rights against W & J.

When M & A defaulted on its subcontract, W & J called on its performance surety, Dynateria, to assume M & A's obligations.  W & J and Dynateria then entered into a written subcontract, under which Dynateria essentially agreed to pick up where M & A left off. W & J for its part promised to pay Dynateria for its work, but it expressly conditioned its payment obligations as follows:

> [W & J] agrees to pay [Dynateria] for the performance of this Subcontract ... subject to payments previously made to [M & A] for work under its Subcontract ..., and further subject to reimbursement to [W & J] for labor costs advanced to [M & A] in the sum of $13,150.00, and payment to Maccaferri Gabions, Inc. in the sum of $57,226.00 for materials delivered to and provided on the project for [M & A].

The parties, of course, disagree as to the meaning of this language.  According to Maccaferri, the agreement anticipates that W & J itself will pay M & A's debt to Maccaferri, and Dynateria will thereafter reimburse W & J for that payment.  W & J, on the other hand, reads it as requiring Dynateria to discharge M & A's unfulfilled duties, including its duty to reimburse W & J for money

previously advanced to M & A, and its duty to pay the balance due on Maccaferri's account. Again, we find that the document is unambiguous and will not reasonably support Maccaferri's proposed reading. *See Smith,* 231 So.2d at 194. Thus, we may, and do, declare its meaning as a matter of law. *See id.; Orkin,* 848 F.2d at 1360. Again, we are mindful of the need to give effect to the entire agreement and to avoid an interpretation that creates an unnecessary conflict between its terms. *See Guaranty Financial,* 928 F.2d at 1000.

We read the agreement as expressly conditioning W & J's duty to pay Dynateria on the latter's assumption of M & A's duties. To that effect, it reduces the amount that will be due Dynateria by amounts already paid to M & A and further conditions payment on Dynateria's performance of two specific tasks: (1) reimbursement of funds W & J advanced to M & A, and (2) payment of the balance due to Maccaferri on its materials contract with M & A. Both of these are actions that, had M & A not defaulted, would have been due from it, but are now expected from its performance surety, Dynateria.

The factual background from which the agreement arose, as expressed by its own preface, confirms our understanding that Dynateria was taking over M & A's duties, including its duty to pay Maccaferri. The agreement recites the fact that M & A was originally hired as the subcontractor, that it took out a performance bond covering its work, that it defaulted on the contract, and that Dynateria now wishes to subcontract with W & J for performance under the same prime contract under which M & A

began its work.  Furthermore, Section 11(c) of the new subcontract, like the identical one in the W & J/M & A subcontract, specifically requires Dynateria to "pay for all materials furnished ... under this Subcontract";  such materials would, of course, include Maccaferri's gabions.

Accordingly, it is clear under the plain language of the subcontract that Dynateria, who was M & A's surety, intended to take over M & A's duties under that subcontract;  one of those duties, as specified in the agreement, was to pay the balance due Maccaferri.  As a result the only promise in this agreement that could have given rise to third-party rights in Maccaferri came not from W & J, but from Dynateria.  Thus, assuming it had such rights, the only party against whom Maccaferri could enforce them is Dynateria.

Maccaferri, of course, suggests a different reading of the agreement.  Maccaferri reads Section 3 of the agreement as conditioning W & J's payment duties on Dynateria's reimbursement of W & J for (1) costs W & J has advanced to M & A—which is consistent with our own reading—and (2) W & J's *own* payment to Maccaferri for the delivered materials.  Thus, Maccaferri's reading suggests that W & J has itself assumed M & A's duty to pay Maccaferri, and will not pay Dynateria until it reimburses W & J for those materials payments.  Such a reading, while not grammatically impossible, risks invalidating the agreement as a whole and conflicts with the other contract provisions mentioned above.

First, Maccaferri's reading would possibly invalidate the contract by rendering W & J's payment promise illusory.  Reading

the language as making W & J's payment duties "subject to [Dynateria's] reimbursement for" *W & J's* future payment of Maccaferri's fees would make W & J's own payment of Maccaferri a condition precedent to its duty to pay Dynateria. Put differently, if W & J never paid Maccaferri—which it had no independent legal obligation to do—then Dynateria could never reimburse W & J for that payment, thus never triggering W & J's duty to pay Dynateria for its work. Such a "promise" by W & J, to pay Dynateria under conditions it alone controls, would be illusory and would not constitute consideration for Dynateria's counter-promise to perform. *See Pan-Am Tobacco Corp. v. Department of Corrections,* 471 So.2d 4, 5 (Fla.1984) (contract is illusory and unenforceable "[w]here one party retains for itself the option of fulfilling or declining to fulfill its obligations under the contract"); *Restatement (Second) of Contracts* §§ 77, 2 cmt. e (promise conditioned on non-mandatory performance of promisor himself is not consideration).

In other words, such an interpretation would destroy the mutuality of obligation under the contract. Under Florida law, as generally, a contract clause should not be interpreted in such a way as to destroy mutuality of obligation and, thereby, invalidate the contract. *See American Medical Int'l v. Scheller,* 462 So.2d 1, 8 (Fla.Dist.Ct.App.1984) (refusing to adopt interpretation of contract that would render it void for lack of mutuality). If instead, the language is read—as we conclude it must be—as requiring Dynateria itself to pay Maccaferri in order to trigger W & J's payment duty, then W & J cannot control the occurrence of a

condition precedent to accrual of its payment duty, thus making the parties' promises mutual and non-illusory.

We also note that finding in this subcontract an undertaking by W & J itself to pay Maccaferri would be inconsistent with the duties of the parties specified elsewhere in the contract. As mentioned above, Section 11(c) of the subcontract requires Dynateria, not W & J, to pay all materialmen; furthermore, Section 12 requires Dynateria to deliver its work to W & J "free from all claims, encumbrances, or liens," including those from materialmen. Thus because the contract otherwise requires Dynateria to pay all materialmen, it would be strange for W & J itself to undertake such a duty to one of Dynateria's primary materialmen, especially in the rather indirect way Maccaferri argues it did.

Accordingly, we conclude that the only legally supportable reading of Section 3 of the subcontract, in light of the entire agreement, is that it obligated Dynateria, not W & J, to pay the balance due Maccaferri under its materials contract with M & A. Thus Maccaferri could not, as a possible third-party beneficiary of Dynateria's promise, enforce that promise against W & J.

Because Maccaferri also cannot recover against W & J as an intended beneficiary of the W & J/M & A subcontract, we conclude that it was error to deny W & J's motion for judgment as a matter of law on Maccaferri's third-party beneficiary claims.

IV.

W & J next claims that the district court erred in failing to grant its Rule 50(a) motion with respect to Maccaferri's promissory estoppel claim. Specifically, it contends that, because Maccaferri

introduced no evidence that W & J ever promised to complete the Lake Okeechobee project using only gabions, Maccaferri cannot now claim that it relied on such a non-existent promise in incurring costs necessary to produce a large number of gabions for the project. We agree with W & J that Maccaferri presented no evidence of such a promise by W & J itself, hence conclude that the district court erred in denying W & J's motion for judgment as a matter of law on that claim.

Florida has adopted the familiar formulation of the promissory estoppel rule stated in Section 90(1) of the *Restatement (Second) of Contracts:*

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcing the promise.

*See W.R. Grace & Co. v. Geodata Servs., Inc.,* 547 So.2d 919, 924 (Fla.1989) (quoting § 90(1)). It is axiomatic that a plaintiff cannot recover for reasonable, detrimental reliance on a promise without proving that the defendant made the promise. *See id.* (denying promissory estoppel claim for failure to sufficiently prove existence of promise).

We have examined each item in the record to which Maccaferri points as evidence of a promise by W & J to complete the entire project using gabions and find no sufficient proof of any such promise. First, Maccaferri claims that W & J made its promise to use only gabions during preliminary contract negotiations between it, W & J, and M & A. On this point, the testimonies of two participants at these negotiations—William Wilkinson and George

Ragazzo, Maccaferri's special projects manager—were presented at trial. Wilkinson admitted that the parties did negotiate regarding the project and that M & A eventually quoted him a price for its work. But Wilkinson never mentioned making any promise to Maccaferri that the project would be completed with gabions only. Interestingly, although Maccaferri's counsel examined Wilkinson twice during the trial, he never questioned Wilkinson regarding specific discussions at this meeting. Thus Wilkinson's testimony does not disclose any promise on which Maccaferri could base its estoppel claim.

Likewise, Ragazzo's testimony—which was read to the jury from the transcript of an earlier proceeding—mentions no promises made by W & J to Maccaferri. Although Ragazzo did testify that "someone" promised him that the project would be completed entirely with gabions, the only someone named in that portion of his testimony is Dynateria. In the absence of proof that Dynateria was somehow acting as W & J's agent when it made this statement, this promise could not be found made by W & J itself. Thus Ragazzo's testimony is no help to Maccaferri on this point.

Maccaferri further claims that a number of documents prove that W & J promised to use its gabions for the entire project.[9]

---

[9]The documents include: (1) the W & J/M & A subcontract, which mentions gabions as one material that M & A could use in its work; (2) M & A's purchase order for $574,304.64 worth of gabions; (3) Maccaferri's letter informing W & J of the specifications of the gabions it was supplying; (4) W & J's certification to the Corps of Engineers that Maccaferri had delivered $132,226.15 worth of gabions to the site; (5) the W & J/M & A joint-check agreement; (6) Dynateria's letter to Maccaferri promising to use the gabions to complete its work on the project.

Although these documents reveal many things—that M & A contracted with Maccaferri, that Maccaferri delivered gabions to the site, that W & J knew the gabions had been delivered, etc.—they are devoid of any reference to a promise by W & J on which Maccaferri could have relied in amassing the materials needed to produce all the gabions.

Because Maccaferri presented no evidence that W & J itself ever promised to use only gabions in constructing the Lake Okeechobee project, the district court erred in denying W & J's motion for judgment as a matter of law on Maccaferri's promissory estoppel claim.

## V.

In view of our holdings that all of Maccaferri's claims should have been dismissed as a matter of law, the parties' several claims respecting the appropriate interest on the judgment now to be vacated are moot.

## VI.

For the reasons discussed above, we REVERSE the district court's orders denying W & J's and Ohio Casualty's Rule 50(a) motions and REMAND with directions to enter judgment in favor of W & J and Ohio Casualty dismissing all of Maccaferri's claims.

*SO ORDERED.*